**AROOSTOOK COUNTY REGIONAL OPHTHALMOLOGY CENTER,** Petitioner

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 95–1291.

United States Court of Appeals, District of Columbia Circuit.

April 12, 1996.

Philip J. Moss was on the briefs for petitioner.

Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Margaret G. Neigus, Supervisory Attorney, and Deborah E. Shrager, Attorney, National Labor Relations Board, were on the brief for respondent.

Before: EDWARDS, Chief Judge, SILBERMAN and GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Aroostook County Regional Ophthalmology Center ("ACROC" or "Company") petitions for review of a National Labor Relations Board ("NLRB" or "Board") order finding that it committed several unfair labor practices in violation of the National Labor Relations Act ("NLRA" or "Act"). *See Aroostook County Regional Ophthalmology Center*, 317 N.L.R.B. 218, 1995 WL 261523 (1995) ("Order").[1]

The Board found ACROC guilty of unfair labor practices for promulgating and enforcing overly restrictive rules limiting the right of employees to discuss office business and work grievances. The Company was also found to have violated the Act in firing employees who violated the rules, and then in denying reinstatement to employees who refused to adhere to unlawful conditions imposed by management.

We find that the disputed rules contained in ACROC's Office Policy Manual do not improperly infringe upon employee rights under the NLRA. Likewise, we find that ACROC was justified in firing employees for good cause. However, we uphold the Board's finding that ACROC improperly imposed illegal conditions upon the rehiring of the fired employees. Accordingly, the petition for review and cross-petition for enforcement each are granted in part and denied in part.

## I. BACKGROUND

Dr. Craig Young, an ophthalmologist, founded ACROC in 1977. Although Dr. Young remains the primary manager of the operation, ACROC employs several physicians to perform eye surgery and to otherwise treat patients who use the Center. The non-physician staff at ACROC is not unionized, and it is undisputed that there has been no union activity or solicitation among these employees.

ACROC's main facility is in Presque Isle, Maine. All of the surgery performed by

---

1. Upon consideration of the record and the parties' briefs, we have determined, *sua sponte*, to decide this appeal without oral argument pursuant to D.C. Circuit Rule 34(j). Accordingly, appellant's motion for reconsideration of this court's order dispensing with oral argument is denied.

ACROC's physicians is done either at the "ambulatory surgery center" at the Presque. Isle facility or, if general anesthesia is required, in a hospital in Presque Isle. ACROC has additional facilities elsewhere in northern Maine, which are operated a few days each month by ACROC personnel who travel from the Presque Isle area in the morning and return the same night.

ACROC's offices are run pursuant to an "Office Policy Manual." Two of the provisions in that manual are at issue in this petition. One states:

> No office business is a matter for discussion with spouses, families or friends.

Aroostook County Regional Ophthalmology Center Office Policy Manual at 4 ("OPM"), *reprinted in* Appendix ("App.") 80. The other states:

> All grievances are to be discussed in private with the office manager or physicians. It is totally unacceptable for an employee to discuss any grievances within earshot of patients.

*Id.* at 21, *reprinted in* App. 97.

On May 29, 1992, four ACROC employees were fired for conduct inconsistent with the foregoing rules. The day before, Dr. Young had changed the work schedules of an ophthalmic technician and three registered nurses in order to accommodate an emergency surgical procedure. Under the revised schedule, the locations to which the employees were to report on May 29 were altered, and two of the employees were required to work from 8 a.m. until 2 p.m. without a lunch break.

When the employees heard of the schedule adjustment, they expressed dissatisfaction and exasperation over the inconvenience caused by the change; they also complained that work schedules at ACROC were often altered. On the evening of May 28, Dr. Young heard from several independent sources that the employees had voiced their complaints within earshot of ACROC patients.

Dr. Young met with the four employees on the morning of May 29. He criticized their behavior over the prior year and he recounted what he had been told about their actions the day before. After a short discussion, Dr. Young fired the employees for misconduct; however, he then told the staff members that they could retain employment with ACROC if they agreed to certain conditions. Two of those conditions, one of which required the employees to bring all complaints to Young and no one else, and the other of which compelled the employees to stop gossiping and complaining amongst themselves, are at issue in this case. Two of the employees rejected Dr. Young's offer; the others opted to retain their employment with ACROC.[2]

·The employees who rejected Dr. Young's offer filed charges with the NLRB,.alleging that the company had committed several unfair labor practices pursuant to section 8(a)(1) of the NLRA.[3] Following issuance of a complaint, an Administrative Law Judge ("ALJ") found the Office Policy Manual provision limiting discussion of business with spouses, families, or friends to be a *prima facie* violation of section 8(a)(1) of the NLRA, because "employees have the right to seek the assistance of, among others, 'spouses, families or friends' on matters pertaining to their terms of employment." Order, 317 N.L.R.B. at 224.. As to the limitation on the time and manner of discussion of employee grievances, the ALJ found that ACROC could restrict employees from discussing grievances "within earshot of patients," but could not otherwise limit with whom employees could discuss their complaints to certain members of ACROC management. *Id.* at 224–25.

Even though the ALJ took issue with ACROC's policies, he found that the Company did not.violate the NLRA in firing the

---

2. One of the remaining employees left ACROC in July 1992 for reasons unrelated to Dr. Young's discussion with the fired employees.

3. Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1) (1994), states that employers commit an unfair labor practice if they "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157." Section 157 guarantees employees the right, *inter alia*, "to engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (1994).

employees, because they were not engaged in protected concerted activity at the time they were fired, and, in any event, the discharge of the employees for discussing their grievances in front of patients was not unlawful. However, the ALJ found that the conditions ACROC placed on the rehiring of the employees violated the NLRA, because the purpose of the conditions was to prevent employees from discussing among themselves dissatisfaction with their employment conditions.

On review, the Board went much further than the ALJ, not only embracing the unfair labor practices cited by the ALJ, but also declaring that the Office Policy Manual provision limiting the discussion of work issues in front of patients and the staff firings violated the Act. According to the Board, changes in work schedules "are directly linked to hours and conditions of work—both vital elements of employment—and are as likely to spawn collective action as the discussion of wages." Order, 317 N.L.R.B. at 220. Thus, according to the Board, the staff conduct that lead Dr. Young to dismiss the affected employees was protected concerted activity.

## II. DISCUSSION

As a threshold matter, we reject ACROC's argument suggesting that, in light of *United States v. Lopez*, — U.S. —, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the NLRB's jurisdiction over this matter is in doubt. The Supreme Court has stated that "Congress intended to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause," *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963) (per curiam). There is nothing in this record that calls into question the Board's jurisdiction over ACROC's operations. Even if ACROC only operates in one state, it has been well-established that the federal government may regulate local businesses that are representative of those " 'throughout the country,' " the activities of which, " 'if left unchecked may well become far-reaching in [their] harm to commerce.' " *Id.* (quoting *Polish Nat'l Alliance of the United States v.*

*NLRB*, 322 U.S. 643, 648, 64 S.Ct. 1196, 1199, 88 L.Ed. 1509 (1944)). Courts have also found that the Board may regulate companies receiving income from interstate sources, *see, e.g., NLRB v. Marsden*, 701 F.2d 238, 240–41 (2d Cir.1983), and purchasing small amounts of supplies in interstate commerce, *see, e.g., NLRB v. Maxwell*, 637 F.2d 698, 703–04 (9th Cir.1981). Presumably, ACROC has such contacts outside of Maine, because the Company "admit[ted] that it is an employer engaged in commerce within the meaning of [the NLRA] and that the Board accordingly has jurisdiction over this matter." Order, 317 N.L.R.B. at 223. We also note that ACROC does not appear to have raised any challenge to the Board's jurisdiction prior to this appeal, so we must assume that ACROC assented to the Board's review of this matter.

We turn then to the merits to determine whether there is substantial evidence to support the Board's findings and conclusions. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *see also* 29 U.S.C. § 160(e) (1994).

### A. *ACROC's Policy Manual*

#### 1. *The Restriction on Discussion of Office Business*

■ The Board adopted the ALJ's determination that ACROC's rule prohibiting employees from discussing "office business" with "spouses, families or friends" was a *prima facie* violation of section 8(a)(1) of the NLRA because "employees have the right to seek the assistance of, among others, 'spouses, families or friends' on matters pertaining to their terms of employment." Order, 317 N.L.R.B. at 224. There can be no quarrel with the claim that, under the NLRA, employees are generally free to discuss the terms and conditions of their employment with family members and friends. But to concede this point lends nothing to the analysis in this case, because the rule in question in no way precludes employees from conferring with or seeking support from family and friends with respect to matters directly pertaining to the employees' terms and conditions of employment. Rather, ACROC argues that the rule—when read in context—is

designed only to prevent employees from discussing *patient medical information* with persons outside of the office. *See, e.g.,* Brief for the Petitioner at 40. This construction of the rule is supported by the rule's placement in the Office Policy Manual as the last sentence of a long discussion regarding patient confidentiality in which the term "office business" is used to refer to confidential patient medical information, *see* OPM at 4, *reprinted in* App. 80, and there is nothing to suggest the contrary.

The Board does not question ACROC's right to require employees to protect patient privacy; so if the rule means what the Company says, it follows that its promulgation and enforcement were not unfair labor practices. In the absence of any evidence that ACROC is imposing an unreasonably broad interpretation of the rule upon employees, the Board's determination to the contrary is unjustified. If an occasion arises where ACROC is attempting to use the rule as the basis for imposing questionable restrictions upon employees' communications, the employees may seek review of the Company's actions at that time. However, the rule on its face is not unlawful.

2. *The Restriction on Discussion of Grievances*

■ According to the Board, ACROC's rule requiring grievances to be discussed in private with Company managers or physicians "is an overly broad restriction of the employees' statutory right to engage in protected concerted activity." Order, 317 N.L.R.B. at 218. The Board does not doubt that ACROC may prohibit employees from disturbing patients by discussing grievances in their presence; rather, the Board faults ACROC for failing to draft the rule more artfully to make it clear that the ban relates only to staff discussions that occur in "immediate patient care areas." *Id.* at 219. Once again, the Board has imagined horrible hypothetical situations (which, if true, might violate the Act) that have nothing much to do with the rule as written and enforced by the

Company. Even worse, in assessing ACROC's rules, the Board has failed to properly take account of the employment context in which this case arises.

The Supreme Court has noted that, "in the context of health-care facilities, the importance of the employer's interest in protecting patients from disturbance cannot be gainsaid." *Beth Israel Hosp. v. NLRB,* 437 U.S. 483, 505, 98 S.Ct. 2463, 2475, 57 L.Ed.2d 370 (1978). ACROC does not operate large facilities where the distinction between patient and non-patient areas can easily be discerned.[4] In a small medical practice, such as ACROC's, the employer has unique concerns about employees acting in a way that might disturb patients; in this situation, a rule prohibiting employees from voicing complaints in front of patients is neither surprising nor unlawful. *See NLRB v. Baptist Hosp., Inc.,* 442 U.S. 773, 784–86, 99 S.Ct. 2598, 2604–06, 61 L.Ed.2d 251 (1979) (An employer could prohibit union solicitation in the corridors and sitting rooms of a large hospital because such activity would disturb patients.). Although the Board suggested that ACROC's rule *might* discourage "employees from *any* discussion of grievances for fear that a patient may overhear the discussion," Order, 317 N.L.R.B. at 218 (emphasis added), this speculation is fanciful at best, and it has nothing to do with the case at hand. The opportunities for the employees to discuss grievances (both in or near the workplace out of the earshot of patients, and after working hours) are obvious and numerous. There is nothing in the record suggesting that employees have been barred from using these opportunities to discuss their mutual concerns. If and when ACROC's employees find that the rule is being unreasonably enforced so as to infringe on protected activities, they may seek appropriate redress.

As to the rule's other element, that employees' discussions of grievances be conducted in private conversations with management level staff, we find that such a requirement seems designed merely to provide a reason-

---

4. ACROC's offices are very different from the large hospital environments considered in cases such as *Beth Israel,* in which the Court held that the Board could invalidate an employer's rule barring protected solicitation in hospital areas, such as the cafeteria, which "function[ed] more as an employee-service area than a patient-care area." 437 U.S. at 506, 98 S.Ct. at 2476.

able and fair procedure for resolution of employment disputes. This requirement is entirely reasonable when read in context with the accompanying provision that employees should not discuss grievances within earshot of patients, implying that the rule's purpose is to ensure that employee complaints are presented to management in an appropriate manner without disruption to ACROC's clients. Moreover, the Board has again presented no evidence indicating that the rule has actually been applied to restrict employees from discussing grievances among themselves or from otherwise engaging in lawful protected concerted activity. In fact, ACROC affirmatively encouraged discussions among employees that did not include physicians or management, for example, through the implementation of "teams" of nurses and technicians. Accordingly, the Board's findings to the contrary on these points must be overturned.

### B. The Treatment of ACROC Employees

#### 1. The Firing

■ In assessing ACROC's actions in firing the four employees, both the ALJ and the Board focused on whether the employees' actions to which Dr. Young objected constituted protected concerted activity. The ALJ found no evidence to suggest that the employees "engaged in any of the behavior at issue 'with the object of initiating group action,'" id. at 228, and, thus, found that the employees' behavior was not protected by the NLRA. The Board reversed the ALJ's determination, noting that, because the employees were discussing vital elements of their employment, such communications are protected by the NLRA because they could "spawn collective action." Id. at 220.

We neither understand nor endorse the Board's "spawning" theory, which, on its face, appears limitless and nonsensical. Certainly, discussion of employment conditions, such as scheduling, could be protected concerted activity; however, adoption of a per se rule that any discussion of work conditions is automatically protected as concerted activity finds no good support in the law.

In this case, an argument could be made that the employees' complaints were concerted activity because the topic of schedule changes is potentially relevant to a labor dispute, see 29 U.S.C. § 152(9) (1994), particularly because schedule changes had been the subject of ongoing discussions between ACROC employees and management. See, e.g., NLRB v. Washington Aluminum Co., 370 U.S. 9, 15, 82 S.Ct. 1099, 1103, 8 L.Ed.2d 298 (1962) (The Court found that a series of "spontaneous individual pleas" regarding working conditions was a labor dispute within the meaning of section 152(9).); NLRB v. Mike Yurosek & Son, Inc., 53 F.3d 261, 265–66 (9th Cir.1995) (Employees' complaints about schedule changes constituted concerted activity, and, thus, employees' subsequent refusal to follow a changed schedule was also concerted activity.). However, we need not resolve this issue, because, even assuming, arguendo, that the fired employees were engaged in a form of concerted activity when they lamented their schedules in the presence of patients, their conduct was not protected concerted activity. See, e.g., id. at 266 ("The fact that an activity is concerted does not necessarily mean that an employee can engage in the activity with impunity.").

In the setting of a small medical office, it is inherently bad conduct for medical staff personnel to complain about their jobs while they are tending patients. Indeed, it cannot be doubted that such misconduct is extremely serious, because it has the great potential to unsettle patients. It is hardly reassuring for a patient, concerned over his or her personal well-being, to be confronted by a medical attendant who seems distracted because of displeasure over the work environment. Such grousing in the presence of patients is plainly inconsistent with the reasonable demands of caretaking, and, therefore, it cannot constitute protected activity. Cf. Baptist Hosp., 442 U.S. at 784, 99 S.Ct. at 2604–05 (The Court permitted an employer to ban union solicitation in certain areas of the hospital in part because such solicitation, "in the presence or within the hearing of patients may have adverse effects on their recovery."). Therefore, ACROC's firing of the employees who engaged in such behavior did

 

not violate the NLRA, and the Board's finding is unjustified.[5]

### 2. *The Conditional Rehiring*

██ Although the Company committed no unfair labor practice when it fired the employees, substantial evidence supported the Board's determination that the conditions imposed by the Company for rehire were unlawful. Dr. Young conditioned the rehiring of the fired employees upon their agreement that they would bring all of their complaints to Dr. Young, that they would avoid any discussions with particular employees, and that they would cease all "gossiping and complaining" amongst themselves. The effect that these conditions likely would have had on the employees' ability to engage in behavior that is protected under the NLRA is so obvious that ACROC has not seriously attempted to defend the legitimacy of the conditions as imposed. Instead, ACROC claims that the employees should have understood that Dr. Young did not really mean what he said; rather, they should have understood that his harsh terms were intended to impose the more reasonable demand that employees discuss their grievances outside the presence of patients. *See* Brief for the Petitioner at 41–43. Neither the ALJ nor the Board were convinced by this argument, and neither are we. Thus, the finding of the Board that

ACROC violated the NLRA by placing improper conditions on the rehiring of fired employees must stand.

### III. CONCLUSION

For the reasons stated herein, the petition for review is granted in part and denied in part, and the Board's cross-petition for enforcement is granted in part and denied in part.

*So ordered.*

---

5. We also reject the Board's argument that the employees could not be dismissed unless they were involved in flagrant, violent, or extreme behavior. First, it is far from clear that complaining in front of patients while treating them is not *extreme* behavior. Second, the NLRA does not impose such a stringent limitation upon employers. Section 10(c) of the NLRA allows employers to discharge employees for cause: "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged ... if such individual was suspended or discharged for cause." 29 U.S.C. § 160(c) (1994). The Supreme Court has acknowledged that the legislative history of the NLRA makes it clear that the specific purpose of section 10(c) is to protect the employer from having to rehire such an individual " 'whether or not the acts constituting the cause for discharge were committed in connection with a concerted activity.' " *NLRB v. Local Union No. 1229, IBEW*, 346 U.S. 464, 473–74, 74 S.Ct. 172, 177–78, 98 L.Ed. 195 (1953) (quoting H.R.REP. No. 510, 80th Cong., 1st Sess. 38–39 (1947)); *see also Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 988 n. 10, 89 L.Ed.

1372 (1945) (" 'The Act, of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time.' " (quoting *Peyton Packing Co.*, 49 N.L.R.B. 828, 843–44 (1943))). Thus, while employers may not rely on a pretextual basis to punish employees engaged in protected concerted activity, there have been scores of cases over the years in which employers have lawfully disciplined employees for misconduct short of that which is flagrant, violent, or extreme. *See, e.g. Vokas Provision Co. v. NLRB*, 796 F.2d 864, 879 (6th Cir.1986) (An employer could discharge employees for leaving work, without permission, to attend Board proceedings even though the employees were under the belief that they were to be subpoenaed to appear at the proceedings by the union.); *International Business Mach. Corp.*, 265 N.L.R.B. 638, 638, 1982 WL 24049 (1982) (The Board found that, even though distribution of wage data would generally constitute protected concerted activity, an employee could lawfully be discharged for knowingly violating a rule barring the dissemination of wage information compiled by the employer.).