**ADTRANZ ABB DAIMLER–BENZ TRANSPORTATION, N.A., INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Machinists Automotive Trades District Lodge No. 190 of Northern California, International Association of Machinists and Aerospace Workers, AFL–CIO, Intervenor.**

No. 00–1282.

United States Court of Appeals, District of Columbia Circuit.

Argued April 9, 2001.

Decided June 26, 2001.

Mark S. Ross argued the cause for petitioner. With him on the briefs was Christopher J. Pirrone.

Jeffrey L. Horowitz, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Leonard R. Page, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Frederick C. Havard, Supervisory Attorney.

David A. Rosenfeld argued the cause for intervenor. With him on the brief was Eric Borgerson.

Before: SENTELLE and KAREN LeCRAFT HENDERSON, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SENTELLE.

Separate Concurring Opinion filed by Senior Circuit Judge SILBERMAN.

SENTELLE, Circuit Judge:

Adtranz ABB Daimler–Benz Transportation N.A., Inc. ("Adtranz") petitions for review of a National Labor Relations Board ("NLRB") order calling for a new representation election. Specifically, Adtranz challenges the NLRB's conclusion that its policies barring abusive and threatening language and limiting solicitation in the workplace constitute unfair labor practices. We vacate the NLRB's unfair labor practice determinations as they are utterly without merit. We do not address the Board's order of a new election, however, as it is not a reviewable final order.

## I. Background

### A. *Relevant Facts*

Petitioner Adtranz refurbishes rail cars for the Bay Area Rapid Transit system in Pittsburg, California. In December 1997, Adtranz distributed a new employee handbook containing "Rules of Conduct" with which employees were expected to comply. Under these rules, "[u]sing abusive or threatening language to anyone on Company premises" is defined as "serious misconduct," punishable with suspension for a first offense and possible termination for a second offense. Adtranz Employee Handbook at 11. "Soliciting or distributing without authorization" is defined as "extremely serious misconduct" and can result in "immediate termination of employment." *Id.* at 10. Under a separate section entitled "Solicitation and/or Distribution" the handbook provided that:

> The unauthorized sale of tickets, solicitation of contributions, or distribution of handbills can disrupt work. Therefore, such activities are not permitted on Company premises during working time except for specific Company-sponsored solicitations or distributions.

> Unauthorized activities include, but are not limited to, distribution of any literature or any material in work areas and solicitation in either work or non-work areas where either the employee soliciting or the employee being solicited is scheduled to be working.

> All solicitation requests must be approved in advance by Human Resources.

*Id.* at 15. The solicitation and distribution rule makes no explicit mention of union activity. A prior version of the employee handbook, however, explicitly covered "efforts on behalf of a labor union."

Beginning in September 1998, Machinists Automotive Trade District Lodge No. 190 of Northern California ("Union") began efforts to unionize the employees at Adtranz's Pittsburg facility. Pursuant to election petitions filed by both Adtranz and the Union, the NLRB conducted a representation election on December 9, 1998. Seventy-nine employees voted in favor of unionization, 135 employees voted against. A non-outcome determinative number of ballots were challenged. Under Section 102.69(a) of the NLRB's rules, the Union had seven days from the tallying of ballots to file objections to the election, and an additional seven days from that filing to furnish evidence in support of the objections.

The Union filed two "Objections to Conduct of Election" on December 16, alleging that Adtranz "interfered with the election by threatening employees with loss of benefits and wages and offering increased benefits or wages to employees" and "provided increase [sic] benefits and wages to employees." The objections made no mention of the handbook provisions at issue in this case. One week later, on December 23, the Union filed an unfair labor practice charge against Adtranz, alleging that various provisions of the employee handbook were overly broad which "interfered with, restrained, and coerced employees in the exercise of the rights guaranteed" by the National Labor Relations Act ("NLRA").

### B. *Proceedings Below*

In response to the Union's unfair labor practice filing, on March 18, 1999, the NLRB Regional Director issued a complaint alleging, among other things, that the company's handbook policies were overly broad in violation of Section 8(a)(1) of the NLRA. 29 U.S.C. § 158(a)(1). That same week the Regional Director consolidated the unfair labor practice complaint with one of the Union's election complaints. The other election complaint was dismissed for lack of evidence.

On May 21, 1999, Adtranz filed a motion *in limine* seeking to bar consideration of the handbook provisions in evaluating the Union's unfair election complaint. Adtranz claimed that consideration of the handbook in relation to the election was procedurally barred under *Burns Int'l Security Servs.*, 256 NLRB 959 (1981), in that the Union did not identify the handbook as a basis for challenging the election within seven days of the election. On June 23, 1999, Associate Chief Administrative Law Judge ("ACALJ") Schmidt issued an order in which he found the handbook provisions to be "wholly unrelated to the conduct alleged in the Union's remaining election objection." The ACALJ nonetheless denied Adtranz's motion to exclude the handbook finding that, under NLRB precedent, the ALJ who would try the case had sufficient discretion to consider the handbook in his proceeding.

On January 2000, an Administrative Law Judge ("ALJ") found that the abusive language and solicitation/distribution provisions of Adtranz's employee handbook constituted unfair labor practices under Section 8(a)(1) of the NLRA and constituted a sufficient basis to overturn the December 1998 election. The ALJ rejected the Union's remaining complaints, including Adtranz's rule limiting employee use of e-mail and the Union's allegation that Adtranz manipulated employee benefits to discourage unionization. *Adtranz ABB Daimler–Benz Transp. N.A., Inc.*, 331 NLRB No. 40, slip op. at 4 (May 31, 2000). The ALJ nonetheless called for a new election and ordered Adtranz to cease and desist from its unfair labor practices and post an appropriate notice at its Pittsburg facility.

On May 31, 2000, the NLRB summarily affirmed the ALJ's conclusions and call for a new election, and issued a revised order. Specifically, the NLRB ordered Adtranz to revise its employee handbook to rescind the "overly broad rules regarding solicitation, distribution, and abusive language" and required that Adtranz post appropriate notice at *all* Adtranz facilities nationwide. *Id.* at 1. One member of the Board dissented in part on the grounds that Adtranz's rule against abusive language did not constitute an unfair labor practice. *Id.* at 1 n. 3.

## II. Merits

Adtranz petitions for review of the NLRB's order, challenging both of the NLRB's unfair labor practice determinations and ordered remedies. The NLRB cross-petitions for enforcement of the order. The Union intervenes in support of the NLRB arguing, *inter alia,* that the use of abusive language, vulgar expletives, and racial epithets "is part and parcel of the vigorous exchange that often accompanies labor relations." Brief of Intervenor at 2.

### A. *Jurisdiction*

As an initial matter, we must address our jurisdiction, or lack thereof, over petitioner Adtranz's claims. This Court has jurisdiction to review a "final order" of the NLRB pursuant to Sections 10(e) and (f) of the NLRA. 29 U.S.C. § 160(e) and (f). An NLRB decision affirming an ALJ's findings of unfair labor practices by an employer is such an order. However, "the Board's direction of a new election is not a final order reviewable under either section 10(e) or section 10(f) of the NLRA." *Gold Coast Restaurant v. NLRB,* 995 F.2d 257, 267 (D.C.Cir.1993) (citing *American Fed'n of Labor v. NLRB,* 308 U.S. 401, 409, 60 S.Ct. 300, 84 L.Ed. 347 (1940)). Should an employer seek "to challenge the new election, it can precipitate an unfair labor practice charge by refusing to recognize the union representation that could result from the election."

*Id.* In the case at hand, this Court has no jurisdiction to consider petitioner's challenge to the NLRB's order of a new election or petitioner's claim that the NLRB improperly considered the employee manuals in its consideration of the Union's election objections. However, we have jurisdiction over petitioner's remaining claims against the Board, and the resolution of these claims will no doubt impact future proceedings concerning the election.

## B. *Standard of Review*

 Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their rights to unionize and engage in related labor activities. 29 U.S.C. § 158(a)(1). The NLRA delegates to the Board "the work of applying the Act's general prohibitory language in the light of the infinite combination of events which might be charged as violative of its terms." *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 798, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). NLRB determinations as to what sort of employer conduct unlawfully restrains or interferes with protected labor activity are entitled to considerable deference so long as they are "reasonably defensible." *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979).

 In evaluating workplace rules promulgated by employers, the NLRB traditionally considers "whether the rules would reasonably tend to chill employees in the exercise" of their statutory rights. *Lafayette Park Hotel,* 326 NLRB 824, 825 (1998). Where the NLRB faithfully applies this standard, and adequately explains the basis for its conclusion, we will enforce its rulings. On the other hand, where the NLRB adopts an unreasonable or otherwise indefensible interpretation of Section 8(a)(1)'s prohibition, we will deny enforcement and vacate the Board's order. This case fits comfortably into the latter category.

## C. *Abusive and Threatening Language*

 Adtranz seeks to maintain a decorous and peaceful workplace. As documented in the employee manual at issue in this case, the company's "shared values" which it deems fundamental to its "continuous pursuit for success" include "[t]rust and respect for self and others," "[t]eamwork and cooperation," and "[e]ffective communication." Adtranz Employee Handbook at 3. In accordance with these values, Adtranz prohibits the use of "abusive or threatening language to anyone on company premises." *Id.* at 11. Adtranz also prohibits harassment and other conduct that could conflict with its values.

To the NLRB and Union Intervenor, Adtranz's effort to maintain a civil and decent workplace is an unfair labor practice that threatens the statutory rights of Adtranz's employees under the NLRA. Prohibiting the use of abusive or threatening language, the Board maintains, has the unrealized potential to chill the exercise of protected activity, as the rule "could reasonably be interpreted as barring lawful union organizing propaganda." *Adtranz ABB,* 331 NLRB No. 40, slip op. at 4. The NLRB does not argue that such "chilling" necessarily has occurred at Adtranz's Pittsburg facility, nor does it maintain that Adtranz either adopted or applied the policy in order to frustrate or discourage union activity. Rather, the NLRB asserts that the rule against the use of abusive and threatening language in the workplace on its face constitutes an unfair labor practice.

Under the Board's reasoning, every employer in the United States that has a rule or handbook barring abusive and threatening language from one employee to anoth-

er is now in violation of the NLRA, irrespective of whether there has ever been any union organizing activity at the company. This position is not "reasonably defensible." It is not even close. In the simplest terms, it is preposterous that employees are incapable of organizing a union or exercising their other statutory rights under the NLRA without resort to abusive or threatening language.

The NLRB notes that union campaigns are heated affairs, often spawning intemperate language. According to the NLRB, the abusive or hostile nature of such outbursts does not strip such language of its protected status, and therefore it is unlawful for a company to threaten punishment for the use of such language. According to the Board and the Union Intervenor, it is perfectly acceptable to use the most offensive and derogatory racial or sexual epithets, so long as those using such language are engaged in union organizing or efforts to vindicate protected labor activity. Expecting decorous behavior from employees is apparently asking too much. Indeed, Union Intervenor suggests that it is unfair to expect union members to comport themselves with general notions of civility and decorum when discussing union matters or exercising other statutory rights. We do not share the Union's low opinion of the working people it purports to represent. America's working men and women are as capable of discussing labor matters in intelligent and generally acceptable language as those lawyers and government employees who now condescend to them.

The NLRB claims that "it is well settled that an employer violates Section 8(a)(1) . . . by maintaining a rule that seeks to broadly prohibit employee speech beyond deliberate or malicious false statements." Brief for the NLRB at 9. This is a stunning misreading of the applicable prece-

dent, including the Board's own prior rulings. Indeed, the NLRB has long held the opposite, noting that "an employee who is engaged in concerted protected activity can, by opprobrious conduct, lose the protection of the Act." *Atlantic Steel Co.*, 245 NLRB 814, 816 (1979). Under *Atlantic Steel,* if an employee is sanctioned for the use of obscenity or abusive language, the Board may not ignore the nature of the language used. Rather the NLRB is *required* to consider "the nature of the employee's outburst," among other factors, in determining whether the employee's activity remains protected. *Id.* See also *Felix Indus. v. NLRB,* 2001 WL 640638 (D.C.Cir. June 12, 2001).

The NLRB is correct that some of its prior precedent could be read to support the proposition it advances here. This proves nothing. Where, as here, the NLRB adopts an unreasonable position, it can find no solace in the fact that it made the same mistake in prior cases. As we have observed in other contexts, "merely applying an unreasonable statutory interpretation for several years [cannot] transform it into a reasonable interpretation." *F.J. Vollmer Co. v. Magaw,* 102 F.3d 591, 598 (D.C.Cir.1996). The NLRB may be bound by its erroneous precedents. We are not. That said, the Board's ruling here is substantially broader than the cases on which it attempts to rely. For instance, the rules at issue in *Lafayette Park Hotel,* 326 NLRB No. 824 (1998), and *Flamingo Hilton–Laughlin,* 330 NLRB No. 34 (1999), barred false, vicious, profane or malicious statements *about the employer.* As such, these rules discouraged speech that is arguably related to protected activities, in a way that "abusive or threatening language" more generally is not. An employer's effort to squelch criticism from employees, and threatening to punish "false" statements

without evidence of malicious intent, is quite different from demanding employees comply with generally accepted notions of civility. The former may well constitute an unfair labor practice in the proper context. The latter, in and of itself, does not. This distinction is fully consistent with *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), which held that libel actions under state law are *only* preempted by the NLRA to the extent that such actions do not require knowledge of the statement's falsity or a reckless disregard for the truth.

The other cases relied upon by the NLRB are no more helpful. In *Great Lakes Steel*, the company's unfair labor practice was a rule prohibiting the possession or distribution of literature—whether or not during working hours—that was "libelous, defamatory, scurrilous, abusive or insulting" or "which would tend to disrupt order, discipline or production within the plants." 236 NLRB 1033, 1033 (1978). This rule did far more than impose a standard of civility on workplace behavior. Thus, the Sixth Circuit Court of Appeals found that the rule "taken as a whole" was "too broad," in no small part because it could prohibit solicitation "during nonworking hours." *Great Lakes Steel v. NLRB*, 625 F.2d 131, 132 (6th Cir.1980).

 We cannot help but note that the NLRB is remarkably indifferent to the concerns and sensitivity which prompt many employers to adopt the sort of rule at issue here. Under both federal and state law, employers are subject to civil liability should they fail to maintain a workplace free of racial, sexual, and other harassment. Abusive language can constitute verbal harassment triggering liability under state or federal law. *See, e.g., Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Given this legal environment, any reasonably cautious employer would consider adopting the sort of prophylactic measure contained in the Adtranz employee handbook. While a single, isolated remark will rarely be sufficient to trigger employer liability, *see Clark County School Dist. v. Breeden*, —— U.S. ——, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), failure to maintain a workplace free of such language can place an employer at significant financial risk nonetheless. *See generally* Eugene Volokh, *What Speech Does 'Hostile Work Environment' Harassment Law Restrict?* 85 Geo. L.J., 627 (1997). Under current law, the "only reliable protection is a zero-tolerance policy, one which prohibits any statement that, when aggregated with other statements, may lead to a hostile environment." *Id.* at 638–39. Indeed, such rules are commonplace. *See, e.g., id.* at 639 n. 35 and citations therein. To bar, or severely limit, an employer's ability to insulate itself from such liability is to place it in a "catch 22."

That the threat of legal liability justifies limitations on threatening language due to the potential for workplace discord or violent confrontations is a principle the NLRB has itself acknowledged. In *Southwestern Bell Tel. Co.*, the NLRB upheld an employer's ban on employees' wearing offensive shirts making derogatory reference to the employer during contract negotiations as a "reasonable precaution against discord and bitterness between employees and management, as well as to assure decorum and discipline in the plant." 200 NLRB 667, 670 (1972).

 We understand that labor negotiations produce occasional intemperate outbursts and, in a specific context, such language may be protected. We also recognize that the uneven or partial application of a rule against abusive and threatening language could constitute an unfair

labor practice if directed against employees seeking to exercise their statutory rights. Yet the Board's position that the imposition of a broad prophylactic rule against abusive and threatening language is unlawful on its face is simply preposterous. It defies explanation that a law enacted to facilitate collective bargaining and protect employees' right to organize prohibits employers from seeking to maintain civility in the workplace.

### D. *Solicitation*

█ The second claim raised by petitioner presents a closer issue, but only slightly. The Adtranz employee handbook contains a rule against "soliciting and distribution without authorization." Adtranz maintains that this rule when read in context, does not discourage or chill protected activity. Instead, petitioner claims, the rules are clearly focused upon preventing work disruptions and curbing potential distractions. As above, the NLRB cites no evidence, let alone substantial evidence, to the contrary. Instead, the NLRB argues that the policy is unlawful on its face because it will "chill" protected labor activity. This, too, is not a "reasonably defensible" position.

Our decision in *Aroostook County Regional Ophthalmology Center v. NLRB*, 81 F.3d 209 (D.C.Cir.1996), is instructive. In *Aroostook*, this Court reversed the NLRB's finding that a policy barring medical office employees from discussing grievances within earshot of patients constituted an unfair labor practice. We held that the NLRB could not declare such a policy to be facially unlawful based upon "fanciful" speculation, but rather had to consider the context in which the rule was applied and its actual impact on employees. As we explained:

In the absence of any evidence that [the employer] is imposing an unreasonably broad interpretation of the rule upon employees, the Board's determination to the contrary is unjustified. If an occasion arises where [the employer] is attempting to use the rule as the basis for imposing questionable restrictions upon employees' communications, the employees may seek review of the Company's actions at that time. However, the rule on its face is not unlawful.

81 F.3d at 213.

█ This legal standard should come as no surprise to the NLRB. Indeed, the NLRB has itself cautioned against parsing workplace rules too closely in a search for ambiguity that could limit protected activity. Rather, the Board should consider "the realities of the workplace" and the actual context in which rules are imposed. *See Lafayette Park Hotel*, 326 NLRB 824 (1998). In the Board's decision before us, however, there is no consideration of the context of Adtranz's rule, or its impact on employees. Indeed, the ALJ's decision adopted by the Board considered nothing more than the General Counsel's claim that "the rule could reasonably interpreted as barring lawful union organizing propaganda or rhetoric." *Adtranz ABB*, 331 NLRB No. 40, slip op. at 3.

█ Unlike the cases relied upon by the ALJ for his decision, *Our Way Inc.*, 268 NLRB 394 (1983); *Laidlaw Transit Inc.*, 315 NLRB 79 (1994); *Opryland Hotel*, 323 NLRB 723 (1997); and *Baldor Electric Co.*, 245 NLRB 614 (1979), the rule in question only applies to conduct during working time and in the work place. In these other cases the invalidated rules prohibited or restricted solicitation, hand-billing and the like during breaks and meals–times when an employer could not usually claim to have a significant interest in preventing workplace "distractions." " 'Working time is for work' is a long-accepted maxim of labor relations." *Our*

*Way,* 268 NLRB at 395 (quoting *Peyton Packing Co.,* 49 NLRB 828, 843 (1943)). Therefore, "rules prohibiting solicitation during working time are presumptively lawful because such rules imply that solicitation is permitted during nonworking time, a term that refers to the employees' own time." *Id.* at 394. Similarly, "an employer's prohibition against employee distribution in work areas at all times is presumptively valid." *Beverly Enterprises–Hawaii, Inc.,* 326 NLRB 335, 335 (1998).

 The NLRB's decisions embody a "long-held standard that rules banning solicitation during working time state with sufficient clarity that employees may solicit on their own time." *Our Way, Inc.,* 268 NLRB at 395. But they also support the principle that the NLRB may not cavalierly declare policies to be facially invalid without any supporting evidence, particularly where, as here, there are legitimate business purposes for the rule in question and there is no suggestion that anti-union animus motivated the policy.

As with the rule against abusive language, Adtranz's rule applies across the board, so it cannot be said to discriminate against unionization efforts or other protected activity. Adtranz also proffered undisputed evidence to the ALJ demonstrating that there was widespread employee solicitation and distribution during nonworktime and that the company encouraged such activities. Not only did the NLRB fail to consider any of petitioner's evidence, it cites no evidence to support its concerns about "chilling" protected activity. Indeed, there is *no* evidence in the record—let alone "substantial evidence"— to suggest that any employees believed that the solicitation and distribution rule prohibited union activities, while some employees claimed the opposite. Thus, we find no basis for the NLRB's holding.

### III. Conclusion

For the reasons set forth above, we vacate the NLRB's order insofar as it found that Adtranz's employee policies constituted unfair labor practices under the NLRA.

SILBERMAN, Senior Circuit Judge, concurring:

I concur in the majority's opinion with respect to "abusive and threatening language" because I agree that it is absurd for the Board to hold that an employer who bans that sort of language—even though the ban has never been implemented in an antiunion fashion nor in a manner that could be thought to interfere with organizational efforts—*per se* violates § 8(a)(1). This charge was an obvious gimmick (fashioned well after the election contest period ended) designed to overturn the election.