KAREN LeCRAFT HENDERSON, Circuit Judge,
dissenting:
By framing the issue on appeal as a question of fact, the majority opinion invokes the deference we owe to the findings of fact of the National Labor Relations Board (NLRB or Board). See Maj. Op. at 28-29. In doing so, however, it ignores the Board’s misapplication of clear — and consistent — Circuit precedent. Because I believe the Board’s misapplication of prec *30 edent makes its decision arbitrary and capricious — and because I also disagree that substantial evidence supports its determination that the two terminated employees did not threaten their supervisor — I respectfully dissent.
I.
As the “balance of plant” general contractor for the construction of the latan power plant in Weston, Missouri, Kiewit Power Constructors Company (Kiewit) was responsible for, among other things, the construction of a turbine building and cooling tower. Kiewit employed almost 800 workers on the project, approximately 630 of whom were unionized, twenty-two of those electricians represented by the International Brotherhood of Electrical Workers (Union). The collective bargaining agreement entered into between Kiewit and the Union provided the electricians with a thirty-minute lunch break. Kiewit nevertheless gave its electricians two additional fifteen-minute breaks each day — one at 9:30 a.m. and one at 3:00 p.m.
Kiewit provided the electricians trailers — called “dry shacks” — in which to take their breaks. The electricians routinely used the dry shacks, which contained microwave ovens, coffee pots and other small appliances and which allowed the electricians to remove their protective equipment, something they felt was not safe to do inside the turbine building. As construction of the turbine building progressed, the electricians began working on higher floors and it took them longer to get from their worksite to the dry shacks. As a result, the electricians began leaving their worksite early so that they arrived at the dry shack by the time their break began and could spend the full fifteen minutes there. The breaks that were supposed to last fifteen minutes thus extended to twenty-five to thirty minutes and Kiewit became concerned about the lost productivity-
Although not obligated to provide morning and afternoon breaks, Kiewit attempted a compromise solution that would preserve the electricians’ breaks at 9:30 a.m. and 3:00 p.m. but limit them to the fifteen minutes Kiewit had offered. Kiewit therefore asked the electricians to “break in place,” i.e., at their workstations in the turbine building, and put tables and chairs in the building for them to use while on break. They refused to break in place, however, and continued to leave their jobs early to go to the dry shacks. Kiewit then informed them it intended to reprimand any electrician who used the dry shack for his break. When they ignored the warning, Kiewit, concluding that “enough was enough,” decided to issue verbal warning notices.
On the morning of May 20, 2008, Field Superintendent Kendall Watts visited the three electrician crews for which he was responsible to distribute the warnings. He began with foreman Tim Walker’s crew. Union steward Mike Potter accompanied Watts as the Union representative. After Watts issued the warning, Potter informed the electricians that neither he nor the Union agreed with Kiewit’s actions. Some members of Walker’s crew told Watts they did not agree and thought Kiewit was being unfair.
Watts next distributed the warning to foreman Andy Holloway’s crew. Potter again expressed his and the Union’s disagreement with the break-in-place policy. In response to a question, Watts informed the crew members that Kiewit intended to “writ[e them] up” if they exceeded the break time that afternoon. Kiewit Power Constructors Co., No. 17-CA-24192, at 6, 2008 WL 5521195 (NLRB Dec. 31, 2008) (ALJ Dec.). Crew member Brian Judd then exclaimed that he had been out of *31 work for a year and that, if he was “laid off[,] it’s going to get ugly and you [Watts] better bring your boxing gloves.” Id. William Bond, another crew member, then declared that he had been out of work for eight months and also warned Watts that “it’s going to get ugly.” Id. Watts did not respond and left to issue the warning to the third crew. After giving the warning to the third crew without incident, Watts reported to his supervisor, Roger Holmes, that Judd and Bond had “threat[ened]” him. Id. at 7. Watts later testified that Judd’s tone was “[a]ngry” when he made the statement. Id. at 6. Holmes agreed the remarks amounted to threats and reported them to his supervisors, all of whom agreed that Judd and Bond should be fired.
The following morning, Holmes and his supervisors met with Potter and Union business agent Pete Raya to discuss the breaks and the termination of Judd and Bond. Raya agreed that the breaks should not exceed fifteen minutes, inclusive of travel time, and “that threats should be taken seriously and should not [be] tolerated.” Id. at 9. Kiewit’s managers then summoned Judd and Bond to the meeting and issued them termination notices and checks. Judd and Bond denied they had threatened Watts. Bond “insisted that he had only told Watts that there would be consequences.” Id. Bond testified that Raya had said that even the less threatening statement Bond said he had made “sound[ed] like a threat to [Raya].” Hr’g Tr. at 166, Kiewit Power Constructors Co., No. 17-CA-24192 (NLRB ALJ Oct. 7, 2008) (Hr’g Tr.) (Bond testimony).
The Union filed a grievance but, after a meeting including Watts, Holmes, Holmes’s immediate supervisor, Potter, Raya and the Union international representative, “the parties agreed that no violation ... occurred” and the Union withdrew the grievance. Letter from Jim Pelley, Int’l Representative, Int’l Bhd. of Elec. Workers, to Kenneth Gibson, Gen. Superintendent, Kiewit Power Constructors & Pete Raya, Bus. Representative, Int’l Bhd. of Elec. Workers Local # 124 (May 29, 2008) (Joint Appendix (JA) 376); see also ALJ Dec. at 10. Judd filed an unfair labor practice charge against Kiewit on June 11, 2008, alleging that Kiewit unlawfully discharged him (and Bond) for engaging in protected activity. The NLRB Regional Director issued a formal complaint on July 31, 2008. An administrative law judge (ALJ) recommended that the complaint be dismissed because the statements made by Judd and Bond were so “opprobrious” that they fell outside the protection of the National Labor Relations Act (NLRA or Act). ALJ Dec. at 10-13. The ALJ found Watts’s account of the events “the most reliable” and concluded “that conflicting accounts [offered by Potter, Judd and Bond] should not be credited.” Id. at 12. Significantly, the Board accepted the ALJ’s credibility determination but disagreed with his recommendation, concluding that Judd and Bond “did not lose the Act’s protection by their remarks to Watts.” Kiewit Power Constructors Co., 355 N.L.R.B. No. 150, at 1 n. 1, 2 (2010) (NLRB Dec.). Board member Peter Schaumber dissented, believing the Board had improperly — and on the basis of a cold record — substituted its credibility and evidentiary determinations for those of the ALJ. NLRB Dec. at 5-6 (Schaumber, dissenting).
II.
Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer “to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in” section 7 of the Act. 29 U.S.C. § 158(a)(1). Among those rights is the *32 right to engage in “concerted activities for the purpose of collective bargaining or other mutual aid or protection.” Id. § 157. An employee engaged in otherwise protected activity, however, “ ‘can, by opprobrious conduct, lose the protection of the Act.’ ” Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB, 253 F.3d 19, 26 (D.C.Cir.2001) (quoting Atl. Steel Co., 245 N.L.R.B. 814, 816 (1979)). The Board uses four factors to determine whether an employee’s otherwise protected conduct is so opprobrious that it loses the protection of the Act: “(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee’s outburst; and (4) whether the outburst was, in any way, provoked by an employer’s unfair labor practice.” Atl. Steel Co., 245 N.L.R.B. at 816. Kiewit concedes the second factor — the subject matter — weighs in favor of finding the electricians’ statements protected. For its part, the Board concedes that the statements were not provoked in any way by any unfair labor practice by Kiewit and therefore the fourth factor favors finding the statements unprotected. The parties thus dispute only the first and third Atlantic Steel factors.
A.
The ALJ found that the first factor — the place of discussion — weighed against finding the statements protected because the “remarks were made in a work area in front of other employees.” ALJ Dec. at 12. The Board disagreed. Although it acknowledged that “an employee’s outburst against a supervisor in a place where other employees could hear it would tend to affect workplace discipline by undermining the authority of the supervisor,” the Board nonetheless concluded that Kiewit “should reasonably have expected that employees would react and protest on the spot” because Kiewit “chose to distribute the warnings in a group employee setting in a work area during working time.” NLRB Dec. at 2. To the extent the Board concluded that the place of the outbursts did not weigh against finding them protected, I find its conclusion neither arbitrary nor capricious. The Board has in the past found statements made in the presence of other employees protected if the employer chooses the location where the statements are made.
I do, however, think the Board acted arbitrarily and capriciously in concluding that the place of the outbursts “tends to favor protection.” Id. (emphasis added). Nothing in the cases relied on by both the Board and the majority opinion suggests to me that statements made in front of other employees are ever more than neutral in balancing the Atlantic Steel factors. See Noble Metal Processing, Inc., 346 N.L.R.B. 795 (2006); Cibao Meat Prods., 338 N.L.R.B. 934, 934-35 (2003), enforced, 84 Fed.Appx. 155 (2d Cir.), cert. denied, 543 U.S. 986, 125 S.Ct. 497, 160 L.Ed.2d 370 (2004); Brunswick Food & Drug, 284 N.L.R.B. 663, 664-65 & nn. 8-9 (1987), enforced mem. sub nom. NLRB v. Kroger Co., 859 F.2d 927 (11th Cir.1988); NLRB v. Sw. Bell Tel. Co., 694 F.2d 974, 977-78 (5th Cir.1982).
B.
The ALJ found that the third factor— the nature of the outbursts — weighed against finding them protected because they “amounted [to] an outright threat ... uttered in anger toward [Judd’s and Bond’s] immediate supervisor with other employees present.” ALJ Dec. at 12. On the other hand, the Board concluded that the nature of the outbursts favored protection because the remarks were unaccompanied by conduct suggesting a physical threat. The Board began by “find[ing] *33 that the remarks by Judd and Bond fall short of the kind of unambiguous physical threat that would render them [Judd and Bond] unfit for service.” NLRB Dec. at 3 (emphasis added); see id. (statements “were not unambiguous or ‘outright’ ... threats of physical violence ” (emphasis added)). The Board continued: “Nothing about the context of th[e] incident suggests that the remarks portended physical confrontation” because there was “no evidence that either Judd or Bond made any accompanying physical gestures or movement toioards Watts. ” Id. (emphases added). Finally, the Board concluded “that the statements by Judd and Bond were ambiguous and, in the absence of any accompanying conduct, cannot be construed as unprotected physical threats.” Id. (emphases added).
But “[i]n Atlantic Steel the Board expressly disavowed any rule whereby otherwise protected activity Svould shield any obscene insubordination short of physical violence.’ ” Felix Indus., Inc. v. NLRB, 251 F.3d 1051, 1055 (D.C.Cir.2001) (quoting Atlantic Steel, 245 N.L.R.B. at 817). “We [have] also rejected] the ... argument that ... employees could not be dismissed unless they were involved in flagrant, violent, or extreme behavior.” Aroostook Cnty. Reg’l Ophthalmology Ctr. v. NLRB, 81 F.3d 209, 215 n. 5 (D.C.Cir.1996) (emphasis added); see also Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 89 L.Ed. 1372 (1945) (“The Act, of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time.”). As we explained in Aroostook County, “there have been scores of cases over the years in which employers have lawfully disciplined employees for misconduct short of that which is flagrant, violent, or extreme.” 81 F.3d at 215 n. 5 (emphasis added). In Felix Industries, we noted that Aroostook “rejected a suggestion ... that employees engaging in protected activity could not be dismissed unless they were involved in flagrant, violent, or extreme behavior.” 251 F.3d at 1055 (internal quotation marks omitted). In Felix, an employee telephoned his supervisor to inquire about additional wages the employer owed him for working night shifts. The supervisor stated that the employee would get “every penny” owed but added that he was tired of “carrying” the employee. Id. at 1053. The employee responded by repeatedly calling the supervisor “ ‘a f-king kid.’ ” Id. The Board found the employee’s conduct protected because it “consisted of a brief, verbal outburst of profane language, unaccompanied by any threat or physical gestures or contact.” Id. at 1054 (emphasis added). We disagreed, explaining, “[t]hat no threat or physical violence accompanied this insubordinate vitriol cannot, under established law, prevent it from weighing in favor of ... losing the protection of the Act.” Id. at 1054-55 (emphasis added) (internal quotation marks and alteration omitted); see also Media Gen. Operations, Inc. v. NLRB, 560 F.3d 181, 188-89 (4th Cir.2009) (“[Wjords alone can be sufficiently violative of [shared interest in maintaining workplace order] so as to lose the protection of the Act.” (citing Felix Indus., 251 F.3d at 1054-55)); cf. Dep’t of Air Force, 315th Airlift Wing v. FLRA 294 F.3d 192, 200 (D.C.Cir.2002) (“mere words could ... result in a loss of’ protection (citing Felix Indus., 251 F.3d 1051)).
The majority opinion — incorrectly, I believe — frames the inquiry as whether substantial evidence supports the Board’s “factual determination” that Judd and Bond did not “physically threaten their supervisor.” Maj. Op. at 28. Felix makes plain, however, that an employee need not physically threaten his supervisor to lose the protection of the Act. “If an employee *34 is fired for denouncing a supervisor in obscene, personally-denigrating, or insubordinate terms ... then the nature of his outburst properly counts against according him the protection of the Act.” Felix, 251 F.3d at 1055. Regardless whether substantial evidence supports the Board’s conclusion that Judd and Bond did not physically threaten Watts — and I agree with the ALJ that they did threaten Watts — the Board acted arbitrarily and capriciously by requiring a physical threat in order for the nature of the outbursts to “weight] in favor of ... losing the protection of the Act.” Id. at 1054-55 (bracket in original) (internal quotation marks omitted); see id. at 1056 (“departure] from precedent ... is arbitrary and capricious”); Titanium Metals Corp. v. NLRB, 392 F.3d 439, 446 (D.C.Cir.2004) (“A Board’s decision will also be set aside when it departs from established precedent without reasoned justification.... ”).
Even were we deciding only whether substantial evidence supports the Board’s determination that Judd’s and Bond’s outbursts were not threats, I would grant Kiewit’s petition. The ALJ, after considering “numerous factors” including “witness bias, consistency, corroboration, the inherent probabilities, reasonable inferences available from the record as a whole, the weight of the evidence, and witness demeanor,” found that the outbursts “amounted [to] an outright threat ... uttered in anger toward [Judd’s and Bond’s] immediate supervisor.” ALJ Dec. at 12. Both the Board decision and majority opinion, however, cast aside the ALJ’s careful and detailed findings and instead rely on past Board decisions that treated threatening statements as protected. As dissenting Board member Schaumber pointed out, however, those cases
are no substitute for the credited testimony of witnesses and careful balancing of the evidence by the trier of fact. One can easily cull from the hundreds of volumes of Board case law decisions in which statements found to be protected may, on paper, appear more menacing or profane than those used here. However, it is not the words themselves, but the manner in which they are delivered and the surrounding circumstances that convey the speaker’s intent. Here, we know that the message delivered was a clear threat — the words make that manifest, and if there were any doubt as to how the words were perceived, Watts dispelled them to the satisfaction of the judge.
NLRB Dec. at 6 (Schaumber, dissenting). Moreover, the cases relied on by the Board and the majority opinion are distinguishable.
In Leasco, Inc., 289 N.L.R.B. 549, 550 (1988), an employee upset about a policy change told a supervisor that he would “kick[] your ass right now.” The Board agreed with the ALJ’s conclusion that the statement was no more than “a colloquialism that standing alone does not convey a threat of actual physical harm.” Id. at 549 n. 1. The threatened company official, although “concerned,” was not “upset” by the statement, “remained around to talk for 10 or more minutes after” the statement was made, and did not view the incident as serious enough to “recommend[ ] disciplinary action.” Id. at 551-52. In contrast, Watts testified that he felt threatened by Judd’s and Bond’s statements and he did not linger after the statements were made but instead considered the threats serious enough to report them immediately to his supervisor. See ALJ Dec. at 6-7; Hr’g Tr. at 282-83 (Oct. 8, 2008) (Watts testimony). And according to Bond, Union business agent Raya agreed that even the less threatening statement Bond claimed to have made “sound[ed] like a threat.” Hr’g Tr. at 166 *35 (Oct. 7, 2008) (Bond testimony); ALJ Dec. at 9. The other cases relied on by the Board and the majority opinion are similarly off-base. See Fairfax Hosp., 310 N.L.R.B. 299, 300 (1993) (employee promised “retaliation” for employer’s unlawful actions but Board, pre-Felix, required “threats of egregious or outrageous conduct”); Vought Corp., 273 N.L.R.B. 1290, 1295 & n. 31 (1984), aff'd sub nom. NLRB v. Vought Corp.-MLRS Sys. Div., 788 F.2d 1378 (8th Cir.1986) (Board concluded employee who told supervisor “I’ll have your ass” was unlawfully provoked by employer’s unfair labor practices and would not have been fired had he not engaged in protected activity where undisputed testimony established that profanity was common in workplace and another employee who made similar statement to supervisor was not fired).
The majority opinion, like the Board dissent, recognizes the importance of context, see Maj. Op. at 28 (“What these words stand for ... is a matter of context.”), but then ignores the context in which the statements were made. That the President of the United States or a vice presidential candidate might have in mind “verbal sparring [or] knock-down arguments” when they threaten to take their gloves off, see id. at 28, says little about what two recently-unemployed workers at a construction site intended when they told Watts that if they were fired,[1] “it’s going to get ugly” and that Watts better “bring [his] boxing gloves.” “Here, we know that the message delivered was a clear threat— the words make that manifest, and if there were any doubt as to how the words were perceived, Watts dispelled them to the satisfaction of the judge” who heard testimony and assessed the demeanor and credibility of the witnesses. NLRB Dec. at 6 (Schaumber, dissenting). There is “no reasoned basis for overturning” the ALJ’s credibility and factual determinations— and plainly no substantial evidence to support doing so. Id.; see also id. at 1 n. 1 (Board decision “finding] no basis for reversing the [ALJ’s credibility] findings”).
My colleagues nonetheless believe it was not arbitrary or capricious for the Board to reject Watts’s testimony — despite the Board’s purported acceptance of the ALJ’s credibility determinations — and to impose its own “objective standard rather than relying solely or primarily on the subjective perceptions of Watts.” Maj Op. at 29 n. 2. The ALJ, however, whose primary duty is to find the facts and assess credibility, found Watts’s testimony to be the most accurate representation of the incident. ALJ Dec. at 12. The Board, moreover, did not reject “solely or primarily ... the subjective perceptions of Watts” but also the perceptions of other Kiewit managers and Union business agent Raya, all of whom viewed the outbursts as threats. See supra p. 31. Additionally, the Union’s international representative, after a grievance meeting at which “[t]he parties received verbal testimony and reviewed written statements,” agreed that Kiewit’s termination of Judd and Bond did not violate the collective bargaining agreement. See Letter from Jim Pelley to Kenneth Gibson (May 29, 2008) (JA 376). How the Board’s cold-record review of factors like credibility, context and demeanor constitutes an “objective” view superior to those *36 of the target of the outbursts, Kiewit managers, the Union business agent and international representative and the ALJ escapes me. See Maj. Op. at 29 n. 2.
Moreover, context can involve more than the specific circumstances of the case sub judice. Phrases like “workplace violence” and “going postal” manifest that today’s work setting is often far from calm, especially in precarious economic times. Moreover, “[t]he object of the National Labor Relations Act is industrial peace and stability.” Auciello Iron Works, Inc. v. NLRB, 517 U.S. 781, 785, 116 S.Ct. 1754, 135 L.Ed.2d 64 (1996); see also United Steelworkers of Am. v. NLRB, 243 F.2d 593, 595-96 (D.C.Cir.1957) (“[Thjere are bounds of language beyond which an employee may not go and still retain his or her right to reinstatement.... The basic policy of the Act is industrial peace.”), rev’d in part on other ground, 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958). The Board’s reinstatement — seconded by my colleagues — of employees who openly challenge by threatening language lawful decisions of their employer compels me to observe: “So much for industrial peace.” Accordingly, I respectfully dissent.

. Overlooked in the analysis of Judd's and Bond’s outbursts is the extent to which they overreacted to Watts’s warning. Watts never said that Kiewit intended to fire Judd, Bond or anyone else. If Judd and Bond had continued to ignore Kiewit’s concededly lawful direction to break in place, they could have been fired eventually. That they immediately assumed they would be fired suggests they intended to continue defying Kiewit, thus further supporting Kiewit's decision to fire them.