Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

––––––––

Argued December 9, 2002   Decided July 25, 2003

No. 01-1432

COMMUNITY HOSPITALS OF CENTRAL CALIFORNIA,
*D/B/A* UNIVERSITY MEDICAL CENTER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

CALIFORNIA NURSES ASSOCIATION,
INTERVENOR

––––––––

On Petition for Review and Cross–Application
for Enforcement of an Order of the
National Labor Relations Board

––––––––

*G. Roger King* argued the cause for petitioner. With him on the brief was *Daniel H. Bromberg*.

––––––––

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*James M. Oleske, Jr.*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *David Habenstreit*, Supervisory Attorney. *Anne M. Lofaso*, Attorney, entered an appearance.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: A union representing nurses charged the new owner of a hospital with an unfair labor practice when it refused to recognize and to bargain with the union. The National Labor Relations Board held the new owner was a successor employer, the nurses at the hospital constituted an appropriate bargaining unit, and the employer, in declining to deal with the union, did not rely upon a good-faith reasonable doubt about the union's majority status. The Board also held certain provisions of the employer's handbook for employees likely to chill protected activity and therefore unlawful. We uphold the decision of the Board and grant its application for enforcement with respect to all matters except the employee handbook, as to which we grant the employer's petition for review.

## I.   Background

For some years Community Hospitals of Central California (Community), a private non-profit company, operated two hospitals in the Fresno, California area, while the County of Fresno operated Valley Medical Center (VMC) and other medical facilities in the County. Nurses working at VMC were the majority of bargaining Unit 7, which included nurses at other facilities operated by the County. Unit 7 was represented by the California Nurses Association (CNA or the Union) for more than 20 years.

In October 1996 Community acquired VMC and renamed it University Medical Center (UMC). In connection with the

acquisition, Community instituted various changes at UMC. In brief, Community consolidated many administrative and support services with those of its other hospital facilities, and by its own account "replaced VMC's traditional, hierarchical facility-based management model with a flattened, service-based system-wide 'shared governance' management structure." Community also allowed nurses to transfer between UMC and its other facilities.

In August 1996, when it was becoming apparent that Community might acquire VMC, the Union demanded that Community recognize and bargain with it. Community acknowledged receipt of the demand, but refused to recognize or to bargain with the Union. The Union filed an unfair labor practice charge and the General Counsel issued a complaint alleging that Community had violated § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5). The Regional Director on his own initiative added an allegation that the maintenance of certain provisions in Community's employee handbook was an unfair labor practice in violation of § 8(a)(1) of the Act.

An Administrative Law Judge held (1) Community was a successor employer to the County, contrary to Community's argument that there was not "substantial continuity" between VMC and UMC; (2) the Unit 7 nurses at UMC constituted an appropriate bargaining unit, notwithstanding Community's argument that the Unit 7 nurses at UMC shared a community of interest with the nurses at its other hospitals; and (3) in failing to recognize the Union, Community did not have or rely upon a good-faith reasonable doubt regarding the Union's majority status. *Cmty. Hosps. of Cent. Cal.*, 335 N.L.R.B. No. 87, at 15–24 (2001) (*Order*). The ALJ also held that (4) Community's handbook violated the Act, as alleged. *Id.* at 24–25. The Board affirmed and substantially adopted the findings and decision of the ALJ,* *id.* at 1–6, over

* The Board held Community was required by the "successor bar rule" of *St. Elizabeth Manor, Inc.*, 329 N.L.R.B. 341, 344 (1999), to bargain with the Union for a reasonable period of time, regardless of any doubt or actual evidence it may have had regarding the

Chairman Hurtgen's dissent with regard to the employee handbook issue. *Id.* at 6–9.

## II.   Analysis

"A [1] successor employer is required to recognize and negotiate with the bargaining agent of the predecessor's employees if [2] the bargaining unit remains appropriate and [3] the successor does not have a good faith doubt of the union's continuing majority support." *Trident Seafoods, Inc. v. NLRB*, 101 F.3d 111, 114 (D.C. Cir. 1996). Community challenges the Board's application of each element in this formula, arguing (1) it was not a successor employer; (2) Unit 7 was not an appropriate bargaining unit after the acquisition; and (3) Community did have and did rely upon a good-faith reasonable doubt in refusing to recognize or to bargain with the Union. Community also claims the Board lacked jurisdiction to rule upon the propriety of its employee handbook, and that in any event the relevant provisions were not unlawful.

We must affirm the Board's order unless "the Board's [factual] findings are not supported by substantial evidence, or . . . the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Tradesmen Int'l, Inc. v. NLRB*, 275 F.3d 1137, 1141 (D.C. Cir. 2002). Questions of law we review with deference to the Board's expertise. *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984).

### A.   Successorship

A new employer is a successor to a former employer "if there is substantial continuity between the enterprises" of the two, *Pa. Transformer Tech., Inc. v. NLRB*, 254 F.3d 217, 222 (D.C. Cir. 2001) (internal quotation marks omitted). The

Union's majority status. *Order* at 2. The Board has since overruled *St. Elizabeth Manor*. *See MV Transp.*, 337 N.L.R.B. No. 129 (2002). The General Counsel therefore does not pursue the point, relying instead upon the Board's alternate holding that Community did not have or rely upon a good-faith reasonable doubt about the Union's majority status. *Order* at 2.

Board's standard for determining substantial continuity is set forth in *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987). There the Court stated with approval the factors the Board uses:

> whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

The Board assesses these factors, no single one of which is dispositive, from the perspective of the employees involved. *Id.* In this case the Board found Community "operates an acute care health facility, in the same location, using essentially the same equipment [as had the County]. The general pool of patients remains the same and they are treated in the same [treatment units]." *Order* at 15. Furthermore, there was no hiatus between the closing of VMC and the opening of UMC, *id.,* and the two organizations employed many of the same supervisors. *Id.* at 16.

In arguing it was not a successor employer, Community does not deny the factual predicate upon which the Board based its decision. Instead it identifies a number of facts it claims cut against the Board's finding of substantial continuity: the change from public to private management; the new supervisory and management structure; changes in the duties, compensation, and benefits of the nurses at the hospital; changes in the nurses' shift schedules and in the organization of support functions; and the adoption of a "partner model" of patient care.

The Board's decision is nonetheless supported by substantial evidence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight"). The Board reasonably found that the nurses at UMC continued to do the same jobs, in the same location, using the same equipment, and treating the same patients as they had before the acquisition, and that the nature of the

employer's business – an acute health care facility – remained the same. Moreover, the Board's decision is in accord with precedent. *See Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 451 (1st Cir. 1990) (successor where hospital is "engaged in the same business of providing health care services to substantially the same community" as had predecessor and employees "perform substantially the same functions"); *NLRB v. New Medico Health Care Ctr. of Mich., Inc.*, No. 91–5271, 1991 U.S. App. LEXIS 30424, at *8–9 (6th Cir. Dec. 20, 1991) (unpublished, per curiam) (substantial evidence of continuity where nursing care center continued "uninterrupted and in the same facility," "[e]mployees [sic] responsibilities remained the same," and new employer "continued to care for the same patients without a substantial change in operation"); *NRNH, Inc.*, 332 N.L.R.B. 300, 2000 NLRB LEXIS 652, at *37 (2000) (substantial continuity found where "entities engaged in the same business, long-term nursing care," providing for the same patients in same building under "almost all of the same supervisors"); *Hosp. San Francisco, Inc.*, 293 N.L.R.B. 171, 172, 1989 NLRB LEXIS 129, at *8 (1989) (similar).

The change from public to private ownership of the hospital does not undermine the Board's finding that Community was a successor. For the contrary proposition, Community invokes *Lincoln Park Zoological Society v. NLRB*, 116 F.3d 216, 220 (7th Cir. 1997), in which the court observed that "there is a readily apparent contrast between a large public employer . . . and a relatively small private entity." The contrast was apparent on the facts of that case because "the represented workforce was diminished by 97 percent" and, the court speculated, "hiring and firing practices, as well as pay and benefit packages, may be different under a closely managed private entity." Initially we note that because the successorship issue was undisputed in *Lincoln Park Zoological Society*, these statements are dicta. Even if they were not dicta, they clearly would not be applicable in this case. Here there was no significant change in the size of the workforce. Community identifies no evidence in the record

to distinguish between itself and the County with respect to hiring and firing practices.

Nor do the changes in hours, wages, benefits, and management to which Community points cast doubt upon the Board's finding of substantial continuity. *See Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 938 (D.C. Cir. 1998) (changes in "size, wages, benefits, training, customer base, managerial philosophy, and supplier contracts" do not preclude finding of substantial continuity when other factors support continuity); *United Food & Commercial Workers Int'l Union, Local 152*, 768 F.2d 1463, 1473–74 (D.C. Cir. 1985) (change of some managerial and supervisory personnel, reduced number of shifts, and minor modifications in production and job assignments did not support Board's finding lack of continuity). Likewise, the types of changes in working conditions Community claims to have made are consistent with a finding of substantial continuity. *See Pa. Transformer*, 254 F.3d at 223 (significant reduction in number of "job classifications" and increase in "employee responsibility and flexibility" not controlling when "employees continue to do the same work . . . . us[ing] the same skills and expertise").

Community contends the change it made in the patient care model used at the hospital instituted a new "production process" within the meaning of the *Fall River Dyeing* test. We disagree. The critical point, as the Board notes in its brief, is that the hospital "continued to function as a full-service, acute-care hospital where registered nurses used the same skills and equipment to provide care for the same general patient population." In sum, the nurses are doing substantially the same work; only their reporting and supervisory structure has changed. We do not think that amounts to a change in the "production process."

## B. Bargaining Unit

In reviewing the Board's selection of a bargaining unit, we are mindful that "the Board need only select *an* appropriate unit, not *the most* appropriate unit." *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 236 (D.C. Cir. 1996). In addition, the Board's decision in this case is bolstered by two presump-

tions.  First, a bargaining unit limited to a single facility is presumptively appropriate.  *Manor Healthcare Corp.*, 285 N.L.R.B. 224, 224–25 (1987).  This presumption may be rebutted by a showing based upon such factors as "geographic proximity, employee interchange and transfer, functional integration, administrative centralization, common supervision, and bargaining history."  *W. Jersey Health Sys.*, 293 N.L.R.B. 749, 751 (1989).  Second, a group of employees with a significant history of representation by a particular union presumptively constitute an appropriate bargaining unit.  *Trident Seafoods*, 101 F.3d at 118.  To rebut this presumption requires a showing of "compelling circumstances" sufficient to "overcome the significance of bargaining history."  *Children's Hosp. of San Francisco*, 312 N.L.R.B. 920, 929 (1993) (ALJ opinion); *see Defereit Paper Co. v. NLRB*, 235 F.3d 581, 584 (D.C. Cir. 2000).  The Board relied upon these two presumptions, *Order* at 1, 18–20, in determining that a bargaining unit consisting of the former Unit 7 nurses at the hospital was appropriate.

Community argues first that the presumptions do not apply in this case because there never was a bargaining unit consisting only of Unit 7 nurses at the hospital;  Unit 7 comprised nurses both at VMC and at other County-operated facilities.  Second, Community claims a bargaining unit consisting only of the Unit 7 nurses located at UMC is not appropriate, and any presumption to the contrary is rebutted, because it has "fully integrated" UMC into its other operations.  In support of the latter point, the employer relies upon (1) the geographic proximity of UMC to Community's other facilities;  (2) the "great deal of employee interchange among [its] facilities";  (3) its "integrated management structure" with "system-wide managerial responsibilities" and centralized administrative support;  and (4) the elimination of certain service functions at UMC, which according to Community, means that a work stoppage at one of its facilities could "have a significant adverse impact upon the continuity of patient care" at the other facilities.

Community's first argument would have us distinguish between a previously recognized bargaining unit and a subset

of such a bargaining unit, limiting the presumption of appropriateness to the former. Community provides no authority for this distinction and, as the Board points out in its brief, it is inconsistent with our precedent. *See Int'l Union of Elec., Radio & Mach. Workers, AFL–CIO–CLC*, 604 F.2d 689, 696 (D.C. Cir. 1979) (affirming Board's finding subset of historic bargaining unit has relevant bargaining history).

That takes us to the question whether the evidence that Community had fully integrated UMC's operations with those of its other facilities is sufficient to rebut the twin presumptions. We readily conclude it is not because we find persuasive Board precedent precisely on point. In *Children's Hospital of San Francisco* two hospitals had merged. The nurses at Children's Hospital had long been represented by the CNA as part of a multi-employer unit. 312 N.L.R.B. at 921 & n.2. After the merger, the employer centralized and consolidated many administrative, management, and training functions, and equalized wages and benefits across the two hospitals. *Id.* at 923–26. It also withdrew recognition from the CNA on the ground that, because the greater number of nurses were at the other hospital, and they were not unionized, the CNA no longer enjoyed majority status. *Id.* at 924. The Board held that the nurses at Children's Hospital alone were an appropriate bargaining unit:

> Children's Hospital had a single facility employing registered nurses, and it dealt continuously with the Union as the representative of those nurses in that facility. That long term relationship was reasonably relied on by the [ALJ] in finding that — where the proffered unit choices are a unit consisting of the facility in which the bargaining relationship had existed and a unit encompassing that facility and another which lacked a similar bargaining history — the single facility is an appropriate unit.

*Id.* at 920. The same is true in this case.

## C. Good Faith Reasonable Doubt

Community raised as an affirmative defense that its refusal to bargain with the Union was based upon its good-faith

reasonable doubt about the Union's majority status. A good-faith doubt is "a genuine, reasonable uncertainty about whether [the Union] enjoy[s] the continuing support of a majority of unit employees." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 367 (1998); *see Order* at 21. The employer has the burden of proof on this issue, *Scepter, Inc. v. NLRB*, 280 F.3d 1053, 1056 (D.C. Cir. 2002), and it must prove not only that it had such a doubt but also that it refused to recognize the union upon the basis of that doubt. *Miller Waste Mills, Inc.*, 334 N.L.R.B. 466, 2001 NLRB LEXIS 485, at *18 (2001).

The ALJ, relying heavily upon Community's failure to respond to the General Counsel's subpoena calling for documents relating to its claim of a good-faith reasonable doubt, *Order* at 23, 18, found that (1) Community did not act in good faith; (2) any doubt it had was not well-founded and was unreasonable; and in any event (3) Community did not rely upon such a doubt in refusing to recognize the Union. *Id.* at 21–24. Community claims each of these findings was erroneous.

We think the Board reasonably concluded Community failed to demonstrate that, when it refused to bargain with the Union, it relied upon such doubt as it may have had about the Union's majority status. That is reason enough to hold the employer committed an unfair labor practice; we need not concern ourselves with Community's first two claims of error.

Community disputes the ALJ's finding that "the record fails to demonstrate who made the decision [not to recognize and bargain with the Union] and why it was made." *Order* at 23. According to the employer, "the undisputed record evidence demonstrates that [its] Board of Directors . . . decided not to recognize and bargain with CNA after receiving input from [a committee formed to study the issue] and outside counsel." Community points to a host of evidence it claims demonstrates that its decision was based upon its doubts about the Union's majority status. Although a great deal of that evidence arguably supports its contention that a good-

faith doubt would have been reasonable in the circumstances, none of it shows that its decision in fact was based upon such a doubt. For example, the testimony of nurses working at UMC that they and many of their co-workers were dissatisfied with the Union, while relevant to whether those nurses may have doubted the Union's majority status, is not relevant to the inquiry whether the employer made its decision based upon any such doubt.

Although Community contends that the decision not to recognize the Union was made by its board of directors, there is no direct evidence in the record indicating when, how, or even whether the directors made such a decision, or indeed ever considered the matter. In the absence of any such evidence, which is peculiarly within Community's control – and which the General Counsel had subpoenaed – the ALJ was justified in inferring that if produced, the evidence would have been unfavorable to the employer. *Cf. United States v. Young*, 463 F.2d 934, 939 (D.C. Cir. 1972) ("if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it permits an inference that the testimony, if produced, would have been unfavorable"). Community argues that inference was inappropriate because the General Counsel neither responded to its attempts to negotiate a mutually agreeable redaction of documents responsive to the subpoena nor sought enforcement of the subpoena. The ALJ would have been justified in drawing the adverse inference, however, even if no subpoena had been issued. Moreover, the result would have been the same even if he had not drawn the inference. Community had the burden of showing it relied upon a good-faith reasonable doubt; absent evidence of its reliance, the ALJ had no need of an adverse inference to find the employer did not meet its burden of proof.

Community objects that by demanding information about its decision the Board was seeking to pry into the internal deliberations of its directors and to require it to disclose assertedly privileged documents. We find this argument singularly unpersuasive. Initially we note that a party holding privileged information that could establish a claim or

defense as to which it has the burden of proof always faces the difficult choice whether to produce that information. Moreover, Community's problem in this case is entirely of its own making; the only reason the proceedings of its board of directors are at issue is that it never responded to the CNA's request to bargain by explaining that it doubted the Union's majority status.

Instead of providing direct evidence of a decision by its board of directors, Community points to testimony by members of an ad hoc committee it formed to determine whether to recognize the Union, and claims the full board decided not to recognize the Union upon the recommendation of this committee. In addition to being circumstantial, the testimony – primarily that of Michael McGinnis, Community's Chief Financial Officer, and of Eileen McCloskey, its human resources manager – is not particularly helpful to the employer. Although Ms. McCloskey did state her understanding that the committee's recommendation was based in part upon the Union's alleged minority status, Mr. McGinnis clearly suggested that any fear the CNA would be a minority union was based upon the UMC nurses being a minority of the full complement of nurses ("whole work force") at Community's three hospitals. As we have seen, however, the Unit 7 nurses at UMC were by themselves an appropriate bargaining unit. The possible minority status of the Union within a larger unit has no bearing upon whether Community was required to recognize and bargain with the Union; and a decision of the board of directors based upon the recommendation of the committee would be founded not upon a good-faith reasonable doubt but upon a misconception.* Under these circumstances, substantial evidence supports the Board's finding that Community failed to carry its burden.

* At oral argument the court raised the question whether an employer's erroneous belief that a union does not represent a majority of employees in the bargaining unit is a "good-faith reasonable doubt" when that belief is based upon a mistake of law about the size of the bargaining unit. Because Community did not argue the point before the Board and on brief before us, however, we need not decide it.

**D. The Employee Handbook**

The Board found that Community violated § 8(a)(1) of the Act by maintaining Rules 1 and 8 in its Employee Handbook. Those rules respectively prohibit "[i]nsubordination, refusing to follow directions, obey legitimate requests or orders, or other disrespectful conduct towards a [supervisor] or other individual," and "[r]elease or disclosure of confidential information concerning patients or employees." The Board was concerned that an employee might interpret the term "disrespectful conduct" in Rule 1 to include solicitation of union support or "concerted employee protest of supervisory activity," and that such protected activity might be chilled as a result. *Order* at 4. The Board was also concerned that an employee might think Rule 8 prohibited discussion of such subjects as wages and other terms of employment. *Id.* at 5. There is no evidence in the record that the handbook provisions actually chilled the protected activity of any employee.

Community raises the threshold objection that the Board should not have passed upon this allegation because it was not "factually related to" any of the allegations in the unfair labor practice charge with which the Union initiated this proceeding, *see Lotus Suites, Inc. v.* NLRB, 32 F.3d 588, 589 (D.C. Cir. 1994); *Nickles Bakery of Ind., Inc.*, 296 N.L.R.B. 927, 928 (1989). Community admits it failed timely to raise this issue at the hearing before the ALJ. Nevertheless, Community argues the relatedness requirement is "jurisdictional," and can therefore be raised at any time. Not so. The exception to the rule that an objection to an agency decision must be timely raised before the agency in order for the court to grant review is limited to jurisdictional challenges "that concern the very composition or constitution of an agency." *Mitchell v. Christopher*, 996 F.2d 375, 378 (D.C. Cir. 1993) (internal quotation marks omitted). Community's challenge clearly is not of that nature; accordingly, its objection, not having been timely made, is forfeit.

We therefore turn to Community's objection to the merits of the Board's decision. The Board holds that the "mere maintenance" of a rule "likely to have a chilling effect" upon

employees' rights to engage in activity protected by § 7 of the Act is an unfair labor practice. *Lafayette Park Hotel*, 326 N.L.R.B. 824, 825 (1998). Where the Board "faithfully applies this standard … we will enforce its rulings," but "where the NLRB adopts an unreasonable or otherwise indefensible interpretation of" the requirements of the Act, we will not. *Adtranz ABB Daimler–Benz Transp., Inc. v. NLRB*, 253 F.3d 19, 25 (D.C. Cir. 2001).

Here the Board held Rule 1 was likely to discourage "concerted employee protest of supervisory activity" and "vigorous proselytizing for or against a union." *Order* at 4. Community maintains that, like the rule in *Adtranz* prohibiting "abusive or threatening language," 253 F.3d at 25 – which we found, contrary to the Board, was lawful, *id.* at 25–28 – Rule 1 is designed merely to "maintain a civil and decent workplace," *id.* at 25, and is well tailored to meet that goal without chilling protected speech or conduct.

We agree. The Board objected chiefly to the Rule's prohibition of "other disrespectful conduct." When read in context, however, that prohibition clearly does not apply to union organizing activity – including "vigorous proselytizing"; it applies to incivility and outright insubordination, in whatever context it occurs. Although Community's employees are perhaps unlikely to know the term *ejusdem generis*, they no doubt grasp as well as anyone the concept it encapsulates: The "other disrespectful conduct" to which Rule 1 refers is clearly conduct of a piece with "insubordination" or "refusing to follow directions [or to] obey legitimate requests or orders." The Board's suggestion that employees would consider "vigorous proselytizing for or against a union," or other protected activity, "insubordinate" within the condemnation of Rule 1, is implausible. In short, to quote the Board itself in a more realistic moment, "any arguable ambiguity" in the rule "arises only through parsing the language of the rule, viewing the phrase … in isolation, and attributing to the [employer] an intent to interfere with employee rights." *Lafayette Park Hotel*, 326 N.L.R.B. at 825.

The Board's concern with respect to Rule 8 was that employees might understand the "[r]elease or disclosure of confidential information" to include the revelation of "information concerning terms and conditions of employment, including wages," *Order* at 5, the sharing of which is useful, indeed perhaps essential, to successful self-organizing. Community again argues the rule must in reason be read more narrowly to prevent disclosure only of "sensitive patient and business information," and not to prohibit discussion with other employees or with union organizers of information about the terms of one's own employment.

Again we agree. The Board's objection to this provision appears to rest chiefly upon the possibility that an employee might believe the rule prohibits him from revealing information, such as wages or a disciplinary record, concerning himself. Unlike the provision at issue in *Brockton Hospital v. NLRB*, 294 F.3d 100, 106–07 (D.C. Cir. 2002), however, the rule covers only "confidential" information. Confidential information is information that has been communicated or acquired in confidence. A reasonable employee would not believe that a prohibition upon disclosing information, acquired in confidence, "concerning patients or employees" would prevent him from saying anything about himself or his own employment. And to the extent an employee is privy to confidential information about another employee or about a patient, he has no right to disclose that information contrary to the policy of his employer. *Cf. Aroostook County Reg'l Opthalmology Ctr. v. NLRB*, 81 F.3d 209, 213 (D.C. Cir. 1996) ("The Board does not question [a hospital's] right to require employees to protect patient privacy").

## III. Conclusion

For the foregoing reasons, Community's petition for review is granted and the Board's application for enforcement denied insofar as each concerns the Board's holding that Rules 1 and 8 of Community's employee handbook violated the Act. In all

other respects the petition is denied and the application for enforcement granted.

*So ordered.*