# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 21, 2011            Decided August 3, 2011

No. 10-1289

KIEWIT POWER CONSTRUCTORS CO.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 10-1312

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

*Charles P. Roberts*, *III* argued the cause for petitioner. With him on the briefs was *Kimberly F. Seten*.

*Renee D. McKinney*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney. *Usha Dheenan* and *Fred B. Jacob*, Attorneys, entered appearances.

Before: HENDERSON, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

GRIFFITH, *Circuit Judge*: When the Kiewit Power Constructors Company warned its electricians that their morning and afternoon breaks were too long, two of them responded that things would "get ugly" if they were disciplined, and one said that the supervisor had "better bring [his] boxing gloves." Each was fired. The National Labor Relations Board (NLRB) reinstated both workers, finding that in context their statements were not physical threats, but were merely figures of speech made in the course of a protected labor dispute. Because the NLRB's findings are supported by substantial evidence, we deny Kiewit's petition for review and grant the cross-application for enforcement.

I

Beginning in 2007, Kiewit worked as a subcontractor providing the design and construction of a turbine and related structures for a coal-fired power plant in Weston, Missouri. Represented by the International Brotherhood of Electrical Workers, the twenty-two electricians employed for the project entered into a collective bargaining agreement with Kiewit in 2008. The agreement provided for only a half-hour lunch break at noon, but Kiewit allowed an additional fifteen-minute break at 9:30 a.m. and another at 3:00 p.m.

The electricians typically took their breaks in a "dry shack," a trailer outside the turbine building that allowed them to remove their protective equipment, something they could

not safely do inside the turbine building because of the danger from ash and falling objects. As construction progressed, the distance between the dry shack and the job sites increased, and the workers began leaving their jobs earlier so that they could spend a full fifteen minutes inside the dry shack. As a result, the morning and afternoon breaks stretched to between twenty-five and thirty minutes. In response, Kiewit announced that electricians were to take breaks in the turbine building rather than the dry shack—a practice called "breaking in place." The union objected, and the electricians continued taking their breaks in the dry shack. Kiewit decided to issue individualized oral warnings to any electrician or foreman who violated the policy. Under the company's rules, employees receive an oral warning for the first violation of a policy, a written warning for a second violation, and suspension or termination for a third violation.

Following the morning break on May 20, which the electricians took in the dry shack, Kiewit's Field Superintendent, Kendall Watts, accompanied by union steward Mike Potter, visited each of the job sites to give the electricians the company's oral warning. Potter told the electricians at each job site that neither he nor the union agreed with the policy. When Watts and Potter came to where Brian Judd and William Bond were working, another electrician asked them if employees would receive a written warning if they took their breaks in the dry shack that afternoon. Watts answered yes. Judd responded that he had "been out of work for a year," and that if he got "laid off it's going to get ugly and [Watts] better bring [his] boxing gloves." *Kiewit Power Constructors Co. & Brian Judd*, 355 N.L.R.B. No. 150, at *15 (2010). Bond also told Watts that he had recently been out of work for eight months and repeated Judd's comment that "it's going to get ugly." *Id.*. Watts did not respond.

Potter and Watts moved on to the other job sites and delivered warning notices to the remaining electricians. Watts then told his supervisor, Roger Holmes, about what Judd and Bond had said, which he called a physical threat. Later that afternoon, Holmes met with his supervisor, Ken Gibson, as well as two managers on the site. All agreed that Judd and Bond should be fired for violating the company's zero-tolerance policy towards workplace violence. The next day, Judd and Bond were summoned to the managers' trailer, where Gibson and Holmes fired them. Judd and Bond pled for their jobs, claiming they had only told Watts that there would be consequences for enforcing a policy against breaking in place. Later that morning, Kiewit agreed to create a shelter in the turbine building where the electricians could break in place and shed their protective gear, and rescinded reprimands for all the electricians except Judd and Bond.

An administrative law judge upheld their dismissal, concluding that their words were threats of physical violence. The NLRB reversed on the ground that their words were only figures of speech made in the course of activity protected by the National Labor Relations Act (NLRA). The NLRB ordered Kiewit to reinstate Judd and Bond, compensate them for lost earnings, remove from its files any reference to the discharges, and to not otherwise hold the incident against them. Two weeks later, Kiewit filed a petition for review in this court. We take jurisdiction pursuant to 29 U.S.C. § 160(e)-(f).

## II

"The courts accord a very high degree of deference to administrative adjudications by the NLRB. When the NLRB concludes that [a] violation of the NLRA has occurred, that finding is upheld unless it 'has no rational basis' or is 'unsupported by substantial evidence.'" *United Steelworkers*

*of Am. v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993) (quoting *United Mine Workers of Am., Dist. 31 v. NLRB*, 879 F.2d 939, 942 (D.C. Cir. 1989). "It is not necessary that we agree that the Board reached the best outcome in order to sustain its decisions. The Board's findings of fact are conclusive when supported by substantial evidence on the record considered as a whole." *Id.* at 244 (D.C. Cir. 1993) (quoting 29 U.S.C. § 160(e)). As we have noted, the Supreme Court has instructed that "a decision of an agency such as the Board is to be reversed only when the record is 'so compelling that no reasonable factfinder could fail to find' to the contrary." *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)).

Moreover, "[w]here the Board has disagreed with the ALJ, as occurred here, the standard of review with respect to the substantiality of the evidence does not change." *Local 702, Int'l Bhd. of Elec. Workers v. NLRB*, 215 F.3d 11, 15 (D.C. Cir. 2000) (internal quotation marks omitted); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951) (holding that "[t]he 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree"). "[C]ases have made clear that [t]he findings and decision of the [ALJ] form an important part of the record on which [the] judgment of substantiality is to be based, and that the Board, when it disagrees with the ALJ, must make clear the basis of its disagreement." *Local 702*, 215 F.3d at 15 (internal quotations marks omitted). "In the end, however, '[s]ince the Board is the agency entrusted by Congress with the responsibility for making findings under the statute, it is not precluded from reaching a result contrary to that of the [ALJ] when there is substantial evidence in support of each result, and is free to substitute its judgment for the [ALJ]'s." *Id*. (internal quotation marks omitted).

The parties agree that Judd and Bond could not lawfully be terminated for merely complaining about Kiewit's break

policy and how it was enforced. Disputing such a condition of employment, Kiewit concedes, is protected by the NLRA. *See* NLRA § 7, 29 U.S.C. § 157 (2006) (protecting the right of employees to "self-organiz[e] . . . to bargain collectively . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection"). But "an employee who is engaged in [protected] activity can, by opprobrious conduct, lose the protection of the Act." *Felix Indus., Inc. v. NLRB*, 251 F.3d 1051, 1053 (D.C. Cir. 2001). Although "employees are permitted some leeway for impulsive behavior when engaging in concerted activity, this leeway is balanced against an employer's right to maintain order and respect" in the workplace. *Piper Realty Co.*, 313 N.L.R.B. 1289, 1290 (1994). When deciding whether the employee's otherwise-protected complaint about workplace policies tipped the balance and forfeited the protection of the Act, the NLRB considers four factors: "(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice." *Atl. Steel Co.*, 245 N.L.R.B. 814, 816 (1979).

On appeal, the parties agree that the subject matter of what Judd and Bond said cuts in favor of protection and that their outburst was not provoked by any unfair labor practice on the part of Kiewit. Kiewit argues, however, that the NLRB abused its discretion by finding that the other factors—the place and nature of the outburst—did not work against the employees and in favor of the company.

A

Relying on *Felix Industries*, Kiewit argues that the location of a confrontation only favors protection for the employee when it occurs in a place that is designated for lodging complaints, such as a "formal grievance setting." 251

F.3d at 1054. But that is not what we held in *Felix Industries*. There, an employee called his employer at work and berated him with obscenities. *Id.* Although we noted that a formal grievance process would surely be an appropriate setting for employee complaints, *id.*, we did not restrict employees to registering complaints through any particular channel.

In this case, the NLRB held that it was reasonable for Judd and Bond to object to enforcement of the new break policy when and where it was announced to them, lest their fellow workers think they consented to the change. Kiewit issued the employees their individualized warnings on the job site in front of other workers, knowing that the electricians opposed the new policy. As the NLRB points out, it has consistently held that while quarrels with management are more likely to disturb the workplace if they are made in front of fellow workers, the NLRB will not hold this against the employee when the company picks a public scene for what is likely to lead to a quarrel. *See NLRB v. Sw. Bell Tel. Co.*, 694 F.2d 974, 978 (5th Cir. 1982) ("Having chosen to argue in front of the other workers, the [c]ompany can hardly be heard to complain about the public nature of the . . . discussion."); *Brunswick Food & Drug*, 284 N.L.R.B. 663, 664-65 (1987), *enforced mem. sub nom. NLRB v. Kroger Co.*, 859 F.2d 927 (11th Cir. 1988).

The NLRB's conclusion—that it was reasonable in this case for employees to respond briefly, spontaneously, and verbally to the disciplinary measure when and where it was announced—is not arbitrary or capricious. As such, we cannot disturb the NLRB's conclusion that the "place" factor does not undermine Judd and Bond's claim that their conduct was protected.

8

B

Kiewit also challenges the NLRB's conclusion that the nature of the employees' outburst did not remove them from the Act's protection. Kiewit's argument starts with the undisputed proposition that employers must be allowed to maintain rules prohibiting harassment and abusive or threatening language. *See Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB*, 253 F.3d 19, 25-28 (D.C. Cir. 2001) (confirming common sense on that issue). Kiewit argues that the NLRB's decision in effect sanctions threats of violence in the workplace, and points out that we have flatly rejected the proposition that employees can only be dismissed for "flagrant, violent, or extreme behavior." *Aroostook Cnty. Reg'l Ophthalmology Ctr. v. NLRB*, 81 F.3d 209, 215 n.5 (D.C. Cir. 1996). We have held that "denouncing a supervisor in obscene, personally-denigrating, or insubordinate terms . . . properly counts against according [the employee] the protection of the Act." *Felix Indus.*, 251 F.3d at 1055 (employee called boss at work to inquire about pay, but ended up insulting him with a string of obscenities). Under our case law, Kiewit concludes, any physical threat against the employer cuts in favor of removing the worker from the protection of the Act.

We have no issue with that recitation of the law. The question, however, is not whether the outburst was something to be encouraged—no outburst is—but whether it was so unreasonable as to warrant denying protections that the Act would otherwise afford.[1] As the NLRB itself has framed the

---

[1] That is not to say, however, that every time an employee's outburst crosses this line, the NLRB must conclude that the employee's otherwise-protected activity is lawfully exposed to discipline. There are still other *Atlantic Steel* factors to consider. It

issue, "when an employee is discharged for conduct that is part of the res gestae of protected concerted activities, the relevant question is whether the conduct is so egregious as to take it outside the protection of the Act, or of such a character as to render the employee unfit for further service." *Consumers Power Co.*, 282 N.L.R.B. 130, 132 (1986) (footnote omitted); *see also NLRB v. Ben Pekin Corp.*, 452 F.2d 205, 207 (7th Cir. 1971) ("[N]ot every impropriety committed during [section 7] activity places the employee beyond the protective shield of the Act and the employee's right to engage in concerted activity may permit some leeway for impulsive behavior." (internal quotation marks omitted)). And, as we have stated before, that only happens when the employee's actions are not simply bad, but "opprobrious." *Felix Indus.*, 251 F.3d at 1053.

In determining which actions are "opprobrious" and thus count against protecting the employee, we defer to the NLRB's distinction between merely intemperate remarks, which the Act protects, and actual threats, which it does not. *See Fairfax Hosp.*, 310 N.L.R.B. 299, 300 (1993) (employee's statement that her supervisor should expect "retaliation" as a result of a new rule was "inherently ambiguous" and thus not so egregious as to lose the Act's protection); *Leasco, Inc.*, 289 N.L.R.B. 549, 552 (1988) (employee who told his supervisor that he was going to "kick [his] ass" was using "a colloquialism that standing alone does

---

is possible for an employee to have an outburst weigh against him yet still retain protection because the other three factors weigh heavily in his favor. *Cf. Felix Indus.*, 251 F.3d at 1055 ("Under the applicable precedents [obscene and personally denigrating] statements do weigh against protection. Whether they weigh enough to tip the balance in that direction is for the Board to decide on remand.").

not convey a threat of actual physical harm"); *Vought Corp.*, 273 N.L.R.B. 1290, 1295 (1984) (where an employee told his supervisor "I'll have your ass," the NLRB found that in context the statement was no more than a threat to file a grievance or report the supervisor to higher management), *enforced*, 788 F.2d 1378 (8th Cir. 1986).

The question, then, is one of fact: did Judd and Bond physically threaten their supervisor? If they did, it counts against them and the NLRB was mistaken. If they did not, the NLRB was reasonable to conclude that the workers were still protected by the Act. And on this factual determination we must defer to the NLRB's answer if supported by substantial evidence, 29 U.S.C. § 160(e), even if we would "have made a different choice had the matter been before [us] *de novo*," *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). We think the NLRB was not unreasonable in concluding that the electricians' statements were not physically threatening.

To state the obvious, no one thought that Judd and Bond were literally challenging their supervisor to a boxing match. Once we acknowledge that the employees were speaking in metaphor, the NLRB's interpretation is not unreasonable. It is not at all uncommon to speak of verbal sparring, knock-down arguments, shots below the belt, taking the gloves off, or to use other pugilistic argot without meaning actual fisticuffs. What these words stand for, of course, is a matter of context. *Compare, e.g.*, http://www.youtube.com/watch?v=3NklthJ7foI (last visited July 6, 2011) (the Capitals' Alex Ovechkin literally dropping gloves to fight the Rangers' Brandon Dubinsky), *with* http://www.youtube.com/watch?v=1xMgbhl2DAk (last visited July 6, 2011) (describing Vice Presidential candidate Sarah Palin as promising that the "gloves are coming off" in the 2008 election), *and* Jonathan Weisman, *Obama's Gloves Are Off — And May*

*Need to Stay Off*, WASH. POST, Apr. 23, 2008, at A1. Indeed, such metaphors are part and parcel of competitive spirit. *See* http://www.youtube.com/watch?v=R6mqFMdhDe4 (describing college basketball phenom Jimmer Fredette as "destroy[ing]" an opponent with his combination of long-range proficiency and acrobatic drives).

The NLRB examined the record here and determined that the "single, brief, and spontaneous reactions by" Judd and Bond were not physical threats, but only expressed vocal resistance to a policy they thought was unfair and unsafe. *Kiewit Power Constructors Co.*, 355 N.L.R.B. No. 150, at \*3. The absence of any physical gestures or other reasons to think Judd and Bond were threatening actual violence supports that view.[2] Given our narrow standard of review, we have no warrant for reversing the NLRB's determination that Judd and Bond were doing nothing more than disagreeing vehemently with Kiewit's policy.

---

[2] The dissent seems to suggest that an employer's subjective perception of an employee's statement is dispositive. *See* Dissenting Op. 10 (noting that "Watts testified that he felt threatened"); *id.* at 11 (describing "how the words were perceived"). On this basis, the dissent characterizes the NLRB as disregarding the ALJ's credibility determination. *See id.* But the NLRB did no such thing. It merely held that the comments were objectively not a threat. And that is consistent with how the NLRB has read the Act in past cases. *See Shell Oil Co.*, 226 N.L.R.B. 1193, 1196 (1976) (upholding ALJ finding that the subjective perception of a supervisor, although taken into account, is not dispositive on whether an employee loses the protection of the Act), *enforced*, 561 F.2d 1196 (5th Cir. 1977). It was not arbitrary or capricious for the NLRB to determine whether the remarks were threatening using an objective standard rather than relying solely or primarily on the subjective perceptions of Watts.

We agree, of course, with our dissenting colleague that the NLRA does not shield "vitriol[ic]" or "obscene insubordination" simply because it is unaccompanied by physical threats. Dissenting Op. 6-7 (quoting *Felix Indus.*, 251 F.3d at 1055). But Kiewit did not contend that the employees' words were unprotected because they were vitriolic or obscene (which they were not); it claimed they were unprotected because they constituted threats of physical violence. The Board did not hold that threats of physical violence are insufficient to violate the Act; only that in context the employees' words were not physical threats. Nor did the Board hold that the employees' words were shielded because they were unaccompanied by physical gestures; only that the absence of such gestures confirmed that Judd and Bond were not making physical threats.

To be sure, Judd and Bond's statements were intemperate, but they did not involve the kind of insubordination that requires withdrawing the Act's protection. It would defeat section 7 if workers could be lawfully discharged every time they threatened to "fight" for better working conditions. *See Sw. Bell Tel. Co.*, 694 F.2d at 978 (upholding NLRB's determination that employee's repeated statement—"I'm going to see that [expletive] fry"— was "at most . . . ambiguous," and reasoning that "however sympathetic we might be to the Company's plight, we simply cannot adopt the Company's arguments [that the comments were so extreme that they necessarily fall outside the Act's protection] because our review is restricted to the substantial evidence test"); *Vought Corp.*, 273 N.L.R.B. at 1295 (employee's statement to supervisor that "I'll have your ass" was no more than a threat to file a grievance or to report the supervisor to higher management), *enforced*, 788 F.2d 1378 (8th Cir. 1986).

13

III

For the foregoing reasons, we deny the petition for review and grant the cross-application for enforcement.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting:

By framing the issue on appeal as a question of fact, the majority opinion invokes the deference we owe to the findings of fact of the National Labor Relations Board (NLRB or Board). *See* Maj. Op. at 10-11. In doing so, however, it ignores the Board's misapplication of clear—and consistent—Circuit precedent. Because I believe the Board's misapplication of precedent makes its decision arbitrary and capricious—and because I also disagree that substantial evidence supports its determination that the two terminated employees did not threaten their supervisor—I respectfully dissent.

**I.**

As the "balance of plant" general contractor for the construction of the Iatan power plant in Weston, Missouri, Kiewit Power Constructors Company (Kiewit) was responsible for, among other things, the construction of a turbine building and cooling tower. Kiewit employed almost 800 workers on the project, approximately 630 of whom were unionized, twenty-two of those electricians represented by the International Brotherhood of Electrical Workers (Union). The collective bargaining agreement entered into between Kiewit and the Union provided the electricians with a thirty-minute lunch break. Kiewit nevertheless gave its electricians two additional fifteen-minute breaks each day—one at 9:30 a.m. and one at 3:00 p.m.

Kiewit provided the electricians trailers—called "dry shacks"—in which to take their breaks. The electricians routinely used the dry shacks, which contained microwave ovens, coffee pots and other small appliances and which allowed the electricians to remove their protective equipment, something they felt was not safe to do inside the turbine building. As construction of the turbine building progressed, the electricians began working on higher floors and it took them longer to get from their worksite to the dry shacks. As a result, the electricians began leaving their worksite early so that they

arrived at the dry shack by the time their break began and could spend the full fifteen minutes there. The breaks that were supposed to last fifteen minutes thus extended to twenty-five to thirty minutes and Kiewit became concerned about the lost productivity.

Although not obligated to provide morning and afternoon breaks, Kiewit attempted a compromise solution that would preserve the electricians' breaks at 9:30 a.m. and 3:00 p.m. but limit them to the fifteen minutes Kiewit had offered. Kiewit therefore asked the electricians to "break in place," i.e., at their workstations in the turbine building, and put tables and chairs in the building for them to use while on break. They refused to break in place, however, and continued to leave their jobs early to go to the dry shacks. Kiewit then informed them it intended to reprimand any electrician who used the dry shack for his break. When they ignored the warning, Kiewit, concluding that "enough was enough," decided to issue verbal warning notices.

On the morning of May 20, 2008, Field Superintendent Kendall Watts visited the three electrician crews for which he was responsible to distribute the warnings. He began with foreman Tim Walker's crew. Union steward Mike Potter accompanied Watts as the Union representative. After Watts issued the warning, Potter informed the electricians that neither he nor the Union agreed with Kiewit's actions. Some members of Walker's crew told Watts they did not agree and thought Kiewit was being unfair.

Watts next distributed the warning to foreman Andy Holloway's crew. Potter again expressed his and the Union's disagreement with the break-in-place policy. In response to a question, Watts informed the crew members that Kiewit intended to "writ[e them] up" if they exceeded the break time that afternoon. *Kiewit Power Constructors Co.*, No. 17-CA-24192, at 6 (NLRB Dec. 31, 2008) (ALJ Dec.). Crew member Brian Judd then exclaimed that he had been out of work for a

year and that, if he was "laid off[,] it's going to get ugly and you [Watts] better bring your boxing gloves." *Id.* William Bond, another crew member, then declared that he had been out of work for eight months and also warned Watts that "it's going to get ugly." *Id.* Watts did not respond and left to issue the warning to the third crew. After giving the warning to the third crew without incident, Watts reported to his supervisor, Roger Holmes, that Judd and Bond had "threat[ened]" him. *Id.* at 7. Watts later testified that Judd's tone was "[a]ngry" when he made the statement. *Id.* at 6. Holmes agreed the remarks amounted to threats and reported them to his supervisors, all of whom agreed that Judd and Bond should be fired.

The following morning, Holmes and his supervisors met with Potter and Union business agent Pete Raya to discuss the breaks and the termination of Judd and Bond. Raya agreed that the breaks should not exceed fifteen minutes, inclusive of travel time, and "that threats should be taken seriously and should not [be] tolerated." *Id.* at 9. Kiewit's managers then summoned Judd and Bond to the meeting and issued them termination notices and checks. Judd and Bond denied they had threatened Watts. Bond "insisted that he had only told Watts that there would be consequences." *Id.* Bond testified that Raya had said that even the less threatening statement Bond said he had made "sound[ed] like a threat to [Raya]." Hr'g Tr. at 166, *Kiewit Power Constructors Co.*, No. 17-CA-24192 (NLRB ALJ Oct. 7, 2008) (Hr'g Tr.) (Bond testimony).

The Union filed a grievance but, after a meeting including Watts, Holmes, Holmes's immediate supervisor, Potter, Raya and the Union international representative, "the parties agreed that no violation . . . occurred" and the Union withdrew the grievance. Letter from Jim Pelley, Int'l Representative, Int'l Bhd. of Elec. Workers, to Kenneth Gibson, Gen. Superintendent, Kiewit Power Constructors & Pete Raya, Bus. Representative, Int'l Bhd. of Elec. Workers Local #124 (May 29, 2008) (Joint

Appendix (JA) 376); *see also* ALJ Dec. at 10. Judd filed an unfair labor practice charge against Kiewit on June 11, 2008, alleging that Kiewit unlawfully discharged him (and Bond) for engaging in protected activity. The NLRB Regional Director issued a formal complaint on July 31, 2008. An administrative law judge (ALJ) recommended that the complaint be dismissed because the statements made by Judd and Bond were so "opprobrious" that they fell outside the protection of the National Labor Relations Act (NLRA or Act). ALJ Dec. at 10-13. The ALJ found Watts's account of the events "the most reliable" and concluded "that conflicting accounts [offered by Potter, Judd and Bond] should not be credited." *Id.* at 12. Significantly, the Board accepted the ALJ's credibility determination but disagreed with his recommendation, concluding that Judd and Bond "did not lose the Act's protection by their remarks to Watts." *Kiewit Power Constructors Co.*, 355 N.L.R.B. No. 150, at 1 n.1, 2 (2010) (NLRB Dec.). Board member Peter Schaumber dissented, believing the Board had improperly—and on the basis of a cold record—substituted its credibility and evidentiary determinations for those of the ALJ. NLRB Dec. at 5-6 (Schaumber, dissenting).

## II.

Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" section 7 of the Act. 29 U.S.C. § 158(a)(1). Among those rights is the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Id.* § 157. An employee engaged in otherwise protected activity, however, " 'can, by opprobrious conduct, lose the protection of the Act.' " *Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB*, 253 F.3d 19, 26 (D.C. Cir. 2001) (quoting *Atl. Steel Co.*, 245 N.L.R.B. 814, 816 (1979)). The Board uses four factors to determine whether an employee's otherwise protected conduct

is so opprobrious that it loses the protection of the Act: "(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice." *Atl. Steel Co.*, 245 N.L.R.B. at 816. Kiewit concedes the second factor—the subject matter—weighs in favor of finding the electricians' statements protected. For its part, the Board concedes that the statements were not provoked in any way by any unfair labor practice by Kiewit and therefore the fourth factor favors finding the statements unprotected. The parties thus dispute only the first and third *Atlantic Steel* factors.

## A.

The ALJ found that the first factor—the place of discussion—weighed against finding the statements protected because the "remarks were made in a work area in front of other employees." ALJ Dec. at 12. The Board disagreed. Although it acknowledged that "an employee's outburst against a supervisor in a place where other employees could hear it would tend to affect workplace discipline by undermining the authority of the supervisor," the Board nonetheless concluded that Kiewit "should reasonably have expected that employees would react and protest on the spot" because Kiewit "chose to distribute the warnings in a group employee setting in a work area during working time." NLRB Dec. at 2. To the extent the Board concluded that the place of the outbursts did not weigh *against* finding them protected, I find its conclusion neither arbitrary nor capricious. The Board has in the past found statements made in the presence of other employees protected if the employer chooses the location where the statements are made.

I do, however, think the Board acted arbitrarily and capriciously in concluding that the place of the outbursts "tends to *favor* protection." *Id.* (emphasis added). Nothing in the cases relied on by both the Board and the majority opinion suggests to me that statements made in front of other employees are ever

more than neutral in balancing the *Atlantic Steel* factors. *See Noble Metal Processing, Inc.*, 346 N.L.R.B. 795 (2006); *Cibao Meat Prods.*, 338 N.L.R.B. 934, 934-35 (2003), *enforced*, 84 F. App'x 155 (2d Cir.), *cert. denied*, 543 U.S. 986 (2004); *Brunswick Food & Drug*, 284 N.L.R.B. 663, 664-65 & nn.8-9 (1987), *enforced mem. sub nom. NLRB v. Kroger Co.*, 859 F.2d 927 (11th Cir. 1988); *NLRB v. Sw. Bell Tel. Co.*, 694 F.2d 974, 977-78 (5th Cir. 1982).

**B.**

The ALJ found that the third factor—the nature of the outbursts—weighed against finding them protected because they "amounted [to] an outright threat . . . uttered in anger toward [Judd's and Bond's] immediate supervisor with other employees present." ALJ Dec. at 12. On the other hand, the Board concluded that the nature of the outbursts favored protection because the remarks were unaccompanied by conduct suggesting a physical threat. The Board began by "find[ing] that the remarks by Judd and Bond fall short of the kind of *unambiguous physical threat* that would render them [Judd and Bond] unfit for service." NLRB Dec. at 3 (emphasis added); *see id.* (statements "were not unambiguous or 'outright' . . . *threats of physical violence*" (emphasis added)). The Board continued: "Nothing about the context of th[e] incident suggests that the remarks portended *physical confrontation*" because there was "no evidence that either Judd or Bond made any accompanying *physical gestures or movement towards Watts*." *Id.* (emphases added). Finally, the Board concluded "that the statements by Judd and Bond were ambiguous and, *in the absence of any accompanying conduct*, cannot be construed as unprotected *physical threats*." *Id.* (emphases added).

But "[i]n *Atlantic Steel* the Board expressly disavowed any rule whereby otherwise protected activity 'would shield any obscene insubordination short of physical violence.' " *Felix Indus., Inc. v. NLRB*, 251 F.3d 1051, 1055 (D.C. Cir. 2001)

(quoting *Atlantic Steel*, 245 N.L.R.B. at 817). "We [have] also reject[ed] the . . . argument that . . . employees could not be dismissed unless they were involved in flagrant, *violent*, or extreme behavior." *Aroostook Cnty. Reg'l Ophthalmology Ctr. v. NLRB*, 81 F.3d 209, 215 n.5 (D.C. Cir. 1996) (emphasis added); *see also Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 n.10 (1945) ("The Act, of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time."). As we explained in *Aroostook County*, "there have been scores of cases over the years in which employers have lawfully disciplined employees for misconduct short of that which is flagrant, *violent*, or extreme." 81 F.3d at 215 n.5 (emphasis added). In *Felix Industries,* we noted that *Aroostook* "rejected a suggestion . . . that employees engaging in protected activity could not be dismissed unless they were involved in flagrant, violent, or extreme behavior." 251 F.3d at 1055 (internal quotation marks omitted). In *Felix*, an employee telephoned his supervisor to inquire about additional wages the employer owed him for working night shifts. The supervisor stated that the employee would get "every penny" owed but added that he was tired of "carrying" the employee. *Id.* at 1053. The employee responded by repeatedly calling the supervisor " 'a f--king kid.' " *Id.* The Board found the employee's conduct protected because it "consisted of a brief, verbal outburst of profane language, *unaccompanied by any threat or physical gestures or contact*." *Id.* at 1054 (emphasis added). We disagreed, explaining, "[t]hat no threat or physical violence accompanied this insubordinate vitriol cannot, *under established law*, prevent it from weighing in favor of . . . losing the protection of the Act." *Id.* at 1054-55 (emphasis added) (internal quotation marks and alteration omitted); *see also Media Gen. Operations, Inc. v. NLRB*, 560 F.3d 181, 188-89 (4th Cir. 2009) ("[W]ords alone can be sufficiently violative of [shared interest in maintaining workplace order] so as to lose the protection of the Act." (citing

*Felix Indus.*, 251 F.3d at 1054-55)); *cf. Dep't of Air Force, 315th Airlift Wing v. FLRA*, 294 F.3d 192, 200 (D.C. Cir. 2002) ("mere words could . . . result in a loss of" protection (citing *Felix Indus.*, 251 F.3d 1051)).

The majority opinion—incorrectly, I believe—frames the inquiry as whether substantial evidence supports the Board's "factual determination" that Judd and Bond did not "physically threaten their supervisor." Maj. Op. at 10. *Felix* makes plain, however, that an employee need not *physically* threaten his supervisor to lose the protection of the Act. "If an employee is fired for denouncing a supervisor in obscene, personally-denigrating, or insubordinate terms . . . then the nature of his outburst properly counts against according him the protection of the Act." *Felix*, 251 F.3d at 1055. Regardless whether substantial evidence supports the Board's conclusion that Judd and Bond did not physically threaten Watts—and I agree with the ALJ that they did threaten Watts—the Board acted arbitrarily and capriciously by requiring a physical threat in order for the nature of the outbursts to "weigh[] in favor of . . . losing the protection of the Act." *Id.* at 1054-55 (bracket in original) (internal quotation marks omitted); *see id.* at 1056 ("depart[ure] from precedent . . . is arbitrary and capricious"); *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 446 (D.C. Cir. 2004) ("A Board's decision will also be set aside when it departs from established precedent without reasoned justification . . . .").

Even were we deciding only whether substantial evidence supports the Board's determination that Judd's and Bond's outbursts were not threats, I would grant Kiewit's petition. The ALJ, after considering "numerous factors" including "witness bias, consistency, corroboration, the inherent probabilities, reasonable inferences available from the record as a whole, the weight of the evidence, and witness demeanor," found that the outbursts "amounted [to] an outright threat . . . uttered in anger toward [Judd's and Bond's] immediate supervisor." ALJ Dec.

at 12. Both the Board decision and majority opinion, however, cast aside the ALJ's careful and detailed findings and instead rely on past Board decisions that treated threatening statements as protected. As dissenting Board member Schaumber pointed out, however, those cases

> are no substitute for the credited testimony of witnesses and careful balancing of the evidence by the trier of fact. One can easily cull from the hundreds of volumes of Board case law decisions in which statements found to be protected may, on paper, appear more menacing or profane than those used here. However, it is not the words themselves, but the manner in which they are delivered and the surrounding circumstances that convey the speaker's intent. Here, we know that the message delivered was a clear threat—the words make that manifest, and if there were any doubt as to how the words were perceived, Watts dispelled them to the satisfaction of the judge.

NLRB Dec. at 6 (Schaumber, dissenting). Moreover, the cases relied on by the Board and the majority opinion are distinguishable.

In *Leasco, Inc.*, 289 N.L.R.B. 549, 550 (1988), an employee upset about a policy change told a supervisor that he would "kick[] your ass right now." The Board agreed with the ALJ's conclusion that the statement was no more than "a colloquialism that standing alone does not convey a threat of actual physical harm." *Id.* at 549 n.1. The threatened company official, although "concerned," was not "upset" by the statement, "remained around to talk for 10 or more minutes after" the statement was made, and did not view the incident as serious enough to "recommend[] disciplinary action." *Id.* at 551-52. In contrast, Watts testified that he felt threatened by Judd's and Bond's statements and he did not linger after the statements

were made but instead considered the threats serious enough to report them immediately to his supervisor. *See* ALJ Dec. at 6-7; Hr'g Tr. at 282-83 (Oct. 8, 2008) (Watts testimony). And according to Bond, Union business agent Raya agreed that even the less threatening statement Bond claimed to have made "sound[ed] like a threat." Hr'g Tr. at 166 (Oct. 7, 2008) (Bond testimony); ALJ Dec. at 9. The other cases relied on by the Board and the majority opinion are similarly off-base. *See Fairfax Hosp.*, 310 N.L.R.B. 299, 300 (1993) (employee promised "retaliation" for employer's unlawful actions but Board, pre-*Felix*, required "threats of egregious or outrageous conduct"); *Vought Corp.*, 273 N.L.R.B. 1290, 1295 & n.31 (1984), *aff'd sub nom. NLRB v. MLRS Sys. Div.*, 788 F.2d 1378 (8th Cir. 1986) (Board concluded employee who told supervisor "I'll have your ass" was unlawfully provoked by employer's unfair labor practices and would not have been fired had he not engaged in protected activity where undisputed testimony established that profanity was common in workplace and another employee who made similar statement to supervisor was not fired).

The majority opinion, like the Board dissent, recognizes the importance of context, *see* Maj. Op. at 10 ("What these words stand for . . . is a matter of context."), but then ignores the context in which the statements were made. That the President of the United States or a vice presidential candidate might have in mind "verbal sparring[ or] knock-down arguments" when they threaten to take their gloves off, *see id.* at 10, says little about what two recently-unemployed workers at a construction site intended when they told Watts that if they were fired,[1] "it's

---

[1] Overlooked in the analysis of Judd's and Bond's outbursts is the extent to which they overreacted to Watts's warning. Watts never said that Kiewit intended to fire Judd, Bond or anyone else. If Judd and Bond had continued to ignore Kiewit's concededly lawful direction to break in place, they could have been fired eventually. That they

going to get ugly" and that Watts better "bring [his] boxing gloves." "Here, we know that the message delivered was a clear threat—the words make that manifest, and if there were any doubt as to how the words were perceived, Watts dispelled them to the satisfaction of the judge" who heard testimony and assessed the demeanor and credibility of the witnesses. NLRB Dec. at 6 (Schaumber, dissenting). There is "no reasoned basis for overturning" the ALJ's credibility and factual determinations—and plainly no substantial evidence to support doing so. *Id.*; *see also id.* at 1 n.1 (Board decision "find[ing] no basis for reversing the [ALJ's credibility] findings").

My colleagues nonetheless believe it was not arbitrary or capricious for the Board to reject Watts's testimony—despite the Board's purported acceptance of the ALJ's credibility determinations—and to impose its own "objective standard rather than relying solely or primarily on the subjective perceptions of Watts." Maj Op. at 11 n.2. The ALJ, however, whose primary duty is to find the facts and assess credibility, found Watts's testimony to be the most accurate representation of the incident. ALJ Dec. at 12. The Board, moreover, did not reject "solely or primarily . . . the subjective perceptions of Watts" but also the perceptions of other Kiewit managers and Union business agent Raya, all of whom viewed the outbursts as threats. *See supra* p. 3. Additionally, the Union's international representative, after a grievance meeting at which "[t]he parties received verbal testimony and reviewed written statements," agreed that Kiewit's termination of Judd and Bond did not violate the collective bargaining agreement. *See* Letter from Jim Pelley to Kenneth Gibson (May 29, 2008) (JA 376). How the Board's cold-record review of factors like credibility, context

immediately assumed they would be fired suggests they intended to continue defying Kiewit, thus further supporting Kiewit's decision to fire them.

and demeanor constitutes an "objective" view superior to those of the target of the outbursts, Kiewit managers, the Union business agent and international representative *and* the ALJ escapes me.  *See* Maj. Op. at 11 n.2.

Moreover, context can involve more than the specific circumstances of the case *sub judice*.  Phrases like "workplace violence" and "going postal" manifest that today's work setting is often far from calm, especially in precarious economic times.  Moreover, "[t]he object of the National Labor Relations Act is industrial peace and stability."  *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 785 (1996); *see also United Steelworkers of Am. v. NLRB*, 243 F.2d 593, 595-96 (D.C. Cir. 1957) ("[Th]ere are bounds of language beyond which an employee may not go and still retain his or her right to reinstatement. . . .  The basic policy of the Act is industrial peace."), *rev'd in part on other ground*, 357 U.S. 357 (1958).  The Board's reinstatement—seconded by my colleagues—of employees who openly challenge by threatening language lawful decisions of their employer compels me to observe: "So much for industrial peace."  Accordingly, I respectfully dissent.